**In re Carol Janet KOCH, Debtor.**

**NORWEST FINANCIAL CONSUMER DISCOUNT COMPANY, Plaintiff,**

**v.**

**Carol Janet KOCH and Mitchell Miller, Esquire, Defendants.**

**Bankruptcy No. 87–00938F.**
**Adv. No. 87–0668F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 15, 1988.

Gary P. Urtz, Havertown, Pa., for plaintiff, Norwest Financial Consumer Discount Co.

Jacquelyn Barnes, Philadelphia, Pa., for debtor/defendant, Carol Janet Koch.

Mitchell Miller, Philadelphia, Pa., for defendant/trustee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Plaintiff, Norwest Financial Consumer Discount Company (Norwest), has filed an adversary proceeding against the debtor, Carol J. Koch, seeking a determination that a debt allegedly incurred by the debtor on January 27, 1987 is nondischargeable. In addition, Norwest contends that Ms. Koch should be denied a discharge. Norwest's positions are grounded upon 11 U.S.C. §§ 523(a)(2)(B), 523(a)(2)(C), and 727(a)(2). For the reasons set forth below, I hold that the debtor did incur a debt to Norwest in the amount of $808.66 which is nondischargeable by virtue of § 523(a)(2)(C). I reject, though, plaintiff's argument that the debt is nondischargeable under § 523(a)(2)(B); and I also reject plaintiff's position that the debtor should be denied her discharge.[1]

### I.

This dispute centers around the alleged sale to the debtor on January 27, 1987, of a video cassette recorder, (VCR), a small television, a radio, and two video cassette tapes by Wall to Wall Sound and Video, located on Cottman Avenue in Philadelphia. Prior to January 27, 1987, Norwest and Wall to Wall Sound had entered into an agreement by which Norwest would provide open-end financing to approved Wall to Wall Sound

---

1. This memorandum opinion represents the findings and conclusions mandated by Bankr. Rule 7052.

customers. On February 27, 1987, the debtor filed a voluntary petition in bankruptcy under chapter 7 and listed, *inter alia*, Norwest. Due to the proximity between the purchase date and the bankruptcy filing, Norwest seeks a determination under 11 U.S.C. § 523(a)(2)(C); moreover, Norwest contends that the debtor misrepresented her financial resources when applying for credit, thereby implicating § 523(a)(2)(B). Additionally, Norwest believes that a discharge should be denied pursuant to 11 U.S.C. § 727(a)(2) because the debtor failed to schedule as assets the items purchased from Wall to Wall Sound.

While these code provisions have generated considerable litigation over the past few years, with courts being asked to interpret and apply these code sections to varying fact patterns, the debtor makes no such request here. Instead, the debtor has proffered an extremely simple response to Norwest's various claims: the debtor denies purchasing any of the items in question and asserts that all documents concerning this transaction which bear her name are forgeries. Although the debtor's response to plaintiff's assertions is simple, resolution of this proceeding is not.

## II.

After a lengthy hearing, the evidence presented can be summarized as follows:

The debtor concedes that approximately January 27, 1987, (she could not recall the precise date), she visited the Wall to Wall Sound store on Cottman Avenue with a co-worker, Calvin Dundrea. Her visit occurred in the evening around 8:00 P.M. and was made with the intention of shopping for and perhaps purchasing a VCR. She remained at the store approximately 1 hour, (shortly before it closed), and while there inspected a Fisher brand VCR, a Sony brand two inch television, and a radio. She inquired of a salesman about their respective purchase prices. This salesman, (who was not called as a witness by either party), attempted to convince her to purchase one or more of the items by explaining the availability of credit terms.

The debtor recalled discussing the possibility of financing with this salesman. In the course of that discussion, she learned that the ultimate lender was Norwest and she informed the salesman that she had two prior loan accounts with Norwest. She provided to the salesman information about her employment, her home address and telephone number, her credit history, and, possibly, her salary. (See N.T., at 21–22, October 7, 1987). She could not recall disclosing her date of birth, social security number, or her assets. She testified, without objection, that at the conclusion of this discussion the salesman expressed his opinion that a loan would be approved which would enable her to purchase the items she desired.

At this point the debtor also testified, and Mr. Dundrea agreed, that she decided not to purchase any items that evening. Rather, she wished to think about the matter overnight and to reach a decision the next day. Therefore, the debtor stated that she signed no documents that evening, and took no items with her. The following day, the debtor stated that she informed the salesman, by telephone, that she was not interested in purchasing any items.

Plaintiff, through the testimony of a manager of one of its branch offices, Ann Marie McCool, introduced into evidence a customer's purchase statement (really, a loan application), a purchase invoice and a revolving credit agreement all dated January 27, 1987, and all bearing the purported signature of Carol J. Koch. The invoice totals $808.66 and lists the items mentioned above. Plaintiff also introduced its internal loan worksheet, again dated January 27, 1987, which states that the debtor was approved for an open end revolving charge account with a $1,000.00 limit. The worksheet contains information verifying the debtor's employment, income[2] and credit history. It also states that, on February

---

2. The loan application lists the debtor's monthly income at $4,800.00. The worksheet verified this income. The debtor testified that her monthly salary was only $1,600.00.

26, 1987, a Norwest employee[3] spoke with the debtor and verified that she had purchased the items in question and was satisfied with their performance.

Prior to January 27, 1987, Norwest agreed to accept loan assignments from Wall to Wall Sound of certain revolving charge accounts. Wall to Wall Sound personnel were to obtain all necessary loan and credit information from the prospective borrowers and supply this information to Norwest; upon receipt, Norwest would decide whether to extend credit. This decision would be communicated to Wall to Wall Sound and the customer within approximately ten minutes of Norwest's receipt of the credit information. In other words, Norwest agreed to check on a prospective borrower's credit worthiness within minutes, thereby enabling Wall to Wall Sound to offer financing to approved customers while those customers were still inside the store.

If loan approval was given by Norwest, and if the customer then decided to finance her purchase, Wall to Wall Sound would obtain the requisite signatures upon various loan documents and forward these documents to Norwest. Norwest would then assign an internal docketing number to the loan, which was distinct from and in addition to an account number. Then, within approximately thirty days, Norwest would forward a check to Wall to Wall Sound in the amount of the purchase price. In this instance, that check was dated February 26, 1987. Prior to sending the check, the Norwest manager testified that it was usual business procedure to verify the purchase with the loan customer. She stated that this procedure was followed in the instant proceeding.

Ms. McCool acknowledged that, in most instances, loan approval could only be granted during normal business hours because verification of employment and debt information was generally limited to that time period. In the matter at bench, there is no dispute that the debtor arrived at the Wall to Wall Sound store at approximately 8:00 P.M.

### III.

Before reaching any factual and legal conclusions, it is useful to establish the statutory framework within which this dispute must be resolved. Primarily, Norwest relies upon 11 U.S.C. § 523(a)(2)(C)[4] which was added to the Bankruptcy Code in 1984. Congress, in amending § 523(a)(2), sought to deter the perceived practice of "loading up" by certain debtors: "loading up" refers to purchasing items on the eve of bankruptcy with the intention of exempting such items and not paying for them. *See e.g., Matter of Smith*, 54 B.R. 299, 303 (Bankr.S.D.Iowa 1985). As the legislative history states:

Section 523 is amended and expanded to address a type of unconscionable or fraudulent debtor conduct not heretofore considered by the code—that of loading

---

**3.** From the handwriting, the Norwest manager identified the employee as her secretary. The secretary was not called to testify.

**4.** Section 523(a)(2) states in relevant part:
§ 523. Exceptions to discharge
(a) A discharge under section 727, 1141, 1228(a), 1228(b), 1328(b), of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
\* \* \* \* \* \*
(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $500 for "luxury goods or services" incurred by an individual debtor on or within forty days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within twenty days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the consumer Credit Protection Act (15 U.S.C. 1601 et seq.).

up. In many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy. The new subsection ... creates a rebuttable presumption that any debt incurred by the debtor within 40 days before the filing of the petition has been incurred under circumstances that would make the debt nondischargeable. Only that portion of a debt which was incurred within the 40–day time period is subject to this presumption. The burden is upon the debtor to demonstrate that the debt was not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt. As the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents are not covered by the presumption.

S.Rep. No. 98–65, 98th Cong. 1st Sess. 58 (1983).

Some courts, in an attempt to determine the applicability of § 523(a)(2)(C) to a given factual setting, have distilled this provision into its component parts. In order to establish that a debt involving a purchase is nondischargeable under this provision, a creditor must demonstrate that there exists: "(1) [a] consumer debt [*see* 11 U.S.C. § 101(7)]; (2) owed to a single creditor; (3) aggregating more than $500.00; (4) for luxury goods or services; (5) incurred by an individual debtor; (6) on or within forty days before the order for relief." *In re Blackburn,* 68 B.R. 870, 873 (Bankr.N.D. Ind.1987). Although helpful, this analysis requires further amplification.

■ The burden of proof is upon the creditor to establish the applicability of § 523(a)(2)(C) since dischargeability provisions are interpreted narrowly, in favor of the debtor. *See e.g., In re Faulk,* 69 B.R. 743, 948 (Bankr.N.D.Ind.1986); *In re Fenninger,* 49 B.R. 307, 309–310 (Bankr.E.D. Pa.1985). Although this subsection establishes a presumption in favor of the creditor, the existence of this presumption does not shift the burden of proof from the creditor, it only shifts the initial burden of production to the debtor. Bankr.Rule 9017

(incorporating Fed.R.Evid. 301). *See also* Fed.R.Evid. 1101(a). Furthermore, what is statutorily presumed is not the existence of any of the six elements listed above; rather, the presumption is that the debtor purchased items without intending to pay for them. In the absence of such a statutory presumption, a creditor who could prove such intent might well obtain a declaration that a debt is nondischargeable by virtue of 11 U.S.C. § 523(a)(2)(A). *See In re Faulk,* 69 B.R. at 755; *Matter of Carpenter,* 53 B.R. 724 (Bankr.N.D.Ga.1985). Thus, the presumption of § 523(a)(2)(C) only shifts to the debtor the initial burden of production regarding the issue of intent; it does not, by itself, shift the ultimate burden of proof or the initial burden of production on any other issues.

In the matter *sub judice,* the debtor offers no challenge to the commonly litigated issues implicated by section 523(a)(2)(C). She introduced no evidence to contest her intent; thus the presumption regarding intent was not overcome. *Compare In re Davis,* 56 B.R. 120, 121 (Bankr.D.Mont. 1985) (debtors demonstrated a clear intention to pay) *with Matter of Ashton,* 51 B.R. 712, 713 (Bankr.W.D.Pa.1985) (debtor's explanation regarding intent was unconvincing). Nor does the debtor contest that the items at issue are luxury goods. *See In re Woods,* 66 B.R. 984, 989 (Bankr.E.D.Pa. 1986); *In re Davis; Matter of Smith.* Her sole defense is that she incurred no debt on January 27, 1987.

Normally, a creditor must meet its burden of proof under 11 U.S.C. § 523(a)(2) by a "clear and convincing standard". *See In re Paolino,* 75 B.R. 641 (Bankr.E.D.Pa. 1987); *In re Woerner,* 66 B.R. 964 (Bankr. E.D.Pa.1986); *In re Fenninger.* Some issues under § 523(a)(2)(C), such as the question of intent, are akin to fraud issues and this difficult evidentiary hurdle should apply to their resolution. But it would be inappropriate to require Norwest to prove the existence of its debt by such a standard, for the debtor's position here is equivalent to objecting to Norwest's proof of claim.[5]

5. In the instant matter, the debtor has claimed all of her assets as exempt. Thus, Norwest was

When considering challenges to proofs of claim, a duly filed proof of claim "constitutes *prima facie* evidence of the validity and the amount of the claim pursuant to Bankr. Rule 3001(f) and § 502(a)." 3 *Collier on Bankruptcy* ¶ 502.01, at 502–16 (15th ed. 1987). ("Collier"). Inasmuch as a duly filed proof of claim is "deemed allowed", 11 U.S.C. § 502(a), the objector has the burden of going forward in support of his objection because the allegations of the proof of claim are taken as true. While the objector must present evidence tending to defeat the proof of claim filed, the ultimate burden of persuasion remains on the creditor filing the proof of claim. 3 *Collier*, ¶ 502.01, at 502–22. The traditional standard of proof imposed upon a creditor seeking to demonstrate the existence of a prepetition debt is by a preponderance of the evidence. 3 *Collier* ¶ 57.13, at 227 (14th ed. 1977); 2 Henderson, *Remington on Bankruptcy*, §§ 1043–1046, at 499 (1956). *See also Ragnar Benson, Inc. v. Bethel Mart Associates*, 308 Pa.Super. 405, 454 A.2d 599 (1982) (In Pennsylvania, the burden of proof in a contract matter is by the preponderance of the evidence).

Thus, even though the dispute concerning the existence of the debt arises in the context of nondischargeability, the narrow issue here is whether it is more likely than not that the debtor purchased the items in question. Certainly, the debtor's testimony that she did not is sufficient to meet any initial burden of production which she had. The question then becomes whether Norwest met its ultimate burden of proof.

### IV.

■ After carefully considering all of the evidence presented, I find the question regarding the existence of a debt a close one but conclude, nonetheless, that it is more likely than not that Ms. Koch pur-

chased the items in question. Important to this conclusion is my comparison of the signatures on the challenged documents with signatures of the debtor that are agreed by all to be authentic on documents also admitted into evidence.

28 U.S.C. § 1731 and Fed.R.Evid. 901 allow a trier of fact to determine, by the method of comparison, whether a signature is genuine or forged. *See United States v. Clifford*, 704 F.2d 86 (3d Cir.1983); *United States v. Woodson*, 526 F.2d 550 (9th Cir. 1975). In comparing the challenged and authentic signatures I find them to be quite similar. For example, the challenged signatures found on exhibits P–9 through P–11 all show no break between the last letter of the debtor's first name and her middle initial; however, there is a break between the middle initial and the first letter of the last name. The exemplars show this same pattern. Such a similarity does not make the possibility of forgery nil, but it does make it less likely than not. Furthermore, to produce such a forgery, the forger would need access to an exemplar. Since the debtor testified that she signed no documents at the store, and since she implicitly argues that the salesman signed her name, she offers no explanation as to how this individual could obtain an exemplar. There is no plausible reason why anyone at Norwest, which admittedly did have an existing exemplar by virtue of her signing prior loan documents, would forward a copy to Wall to Wall Sound.[6]

■ In addition, the possibility of a forgery is lessened by the verification procedures utilized by Norwest, and by the appearance of the lender's internal document number on the debtor's schedules. Thus, I conclude, by a preponderance standard, that it is more likely than not that the debtor purchased the items and incurred a debt to Norwest.[7] Since that was the only

---

not obligated to file any proof of claim, and has not done so. Bankr. Rules 2002(e), 3002(C)(5).

6. Since the Norwest check is made payable to Wall to Wall Sound, not to any individual, if the salesman had forged the debtor's signature it would have been done to obtain illegal possession of the items on the purchase order, (or to

be paid some unspecified commission), not to obtain the sale proceeds.

7. This is not to say that the creditor's position was airtight. If Norwest verified the debtor's income, how did it obtain such an inaccurate figure? If it checked her credit history, how did it extend credit when the debtor's schedules reflect numerous unpaid credit card debts?

issue raised by the debtor, and the other elements of § 523(a)(2)(C) are unchallenged, I find that this debt is nondischargeable pursuant to § 523(a)(2)(C).

## IV.

■ Although I need not reach the issue of whether Ms. Koch's debt to Norwest is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B), I note that section 523(a)(2)(B) requires proof by clear and convincing evidence of reasonable reliance on the debtor's materially false written statement.[8] *See e.g. Knoxville Teachers Credit Union v. Parkey,* 790 F.2d 490 (6th Cir. 1986).

Here, Norwest presumably seeks to have the debt declared nondischargeable based on the allegedly false statements made in the loan application as to the debtor's employment, income and credit history. Norwest, however, cannot make the required showing of reasonable reliance pursuant to section 523(a)(2)(B)(iii). In fact, Norwest introduced evidence, in the form of its worksheet, which indicated that the information provided by Ms. Koch on the credit application was independently verified.[9] Moreover, insofar as the code requires that the written statement relied on be one which "the debtor caused to be made or published with intent to deceive", 11 U.S.C. § 523(a)(2)(B)(iv), Norwest failed to make such showing by clear and convincing evidence. Although, as discussed above, Norwest established that Ms. Koch signed the credit application by a preponderance of the evidence, it did not present clear and convincing evidence that she signed, let alone that she provided any information contained in the application with the requisite intent to deceive.

■ Similarly, Norwest's burden under 11 U.S.C. § 727(a)(2) is to establish the debtor's intent to hinder, delay or defraud the estate by concealing property.[10] Bankr.Rule 4005; *In re McCall,* 76 B.R. 490 (Bankr.E.D.Pa.1987). *See In re Wolf,* 165 F.2d 707, 710 (3rd Cir.1948). It follows logically that if the debtor does have a debt to Norwest, she bought and therefore possesses the items which Norwest financed so as to have failed to properly disclose those items in her schedule of assets. However, failure to disclose does not, without more, establish the requisite intent under § 727 to hinder, delay or defraud the estate by concealing assets.[11] *See Miles Employee Federal Credit Union v. Griffin,* 22 B.R. 821 (Bankr.S.D.Ohio 1982).

---

Moreover, unless these items were purchased upon the debtor's return to Wall to Wall Sound the following day, how was loan approval granted after normal business hours? (Perhaps January 27, 1987 is the day following the debtor's initial visit to Wall to Wall Sound. The debtor and Mr. Dundrea were not certain when they went shopping together.)

8. Section 523(a)(2)(B) states:
§ 523. Exceptions to discharge
(a) A discharge under section 727, 1141, 1228(a), 1228(b), 1328(b), of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(B) use of instrument in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

9. In addition, Norwest had information related to the debtor's creditworthiness which it obtained when it entered into two prior loan agreements with Ms. Koch.

10. 11 U.S.C. § 727(a)(2) states:
(a) The court shall grant the debtor a discharge, unless—
(2) the debtor, with intent to hinder, delay, or defraud. a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
(A) property of the debtor within one year before the date of the filing of the petition; or
(B) property of the estate after the date of the filing of the petition.

11. Here, if the property is in the possession of Ms. Koch, she almost certainly could have exempted it pursuant to 11 U.S.C. § 522(d)(3) or (d)(5).

Norwest has thus failed to carry its burden.[12]

An appropriate order will be entered.

## ORDER

AND NOW, this 15 day of March, 1987, upon consideration,

It is hereby ORDERED that the Chief Deputy Clerk in Charge of Bankruptcy Operations shall enter judgment pursuant to Bankr. Rule 9021(c) in favor of plaintiff and against defendant providing that defendant's debt of $808.66 to the plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(C). Judgment shall be entered in favor of the defendant on plaintiff's claims under 11 U.S.C. §§ 523(a)(2)(B) and 727(a)(2).

---

12. Moreover, by listing Norwest as a creditor, she provided Norwest an opportunity to dispute the debt pursuant to 11 U.S.C. § 523(a) and thereby to obtain its remedy.