In re Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Debtors.

AMERICAN EXPRESS CENTURION BANK, Plaintiff,

v.

Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Defendants.

CITIBANK (SOUTH DAKOTA), Plaintiff,

v.

Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Defendants.

AMERICAN EXPRESS CENTURION BANK, Optima Card Division, Plaintiff,

v.

Wallace Bigham HINSHAW, Jr., Defendants.

BARNETT BANK, Plaintiff,

v.

Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Defendants.

HOUSEHOLD CREDIT SERVICES, INC., Plaintiff,

v.

Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Defendants.

SUN BANK, Plaintiff,

v.

Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Defendants.

FIRST CARD SERVICES, INC., Plaintiff,

v.

Wallace Bigham HINSHAW, Jr. and Suzanne B. Hinshaw, Defendants.

Bankruptcy No. 92–07362–9P1.
Adv. Nos. 92–719, 92–723 to 92–728.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

April 27, 1995.

Order Clarifying Decision on Rehearing Aug. 28, 1995.

Scott W. Spradley, Orlando, FL, Randolph Fabal, Robert M. Coplen, Kevin P. O'Brien, Tampa, FL, for Plaintiffs.

Dennis J. LeVine, Tampa, FL, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 Reorganization case, and the matter under consideration is the dischargeability vel non of the debts admittedly due and owing by WALLACE B. HINSHAW, JR. (Debtor) to AMERICAN

EXPRESS CENTURION BANK, CITI-BANK, AMERICAN EXPRESS OPTIMA, BARNETT BANK, HOUSEHOLD CREDIT SERVICES, SUN BANK AND FIRST CARD SERVICES (Plaintiffs). The court has consolidated these seven adversary proceedings. Although the original complaints named as a defendant Suzanne B. Hinshaw, the Debtor's wife, all of the Plaintiffs dismissed their complaint against her at the commencement of the trial.

It is the Plaintiffs' contention that the obligations owed by the Debtor should be excepted from the overall protective provisions of the general bankruptcy discharge because the Debtor obtained credit when he had no intent to repay the same or knew that he lacked the ability to repay the obligation. Thus, according to the Plaintiffs, this debt is nondischargeable by virtue of § 523(a)(2)(A) of the Bankruptcy Code. Additionally, certain of the charges made by the Debtor, specifically, a $10,000 charge on the AMERICAN EXPRESS Platinum Card and $1,800 in cash advances on the AMERICAN EXPRESS OPTIMA Card, were incurred within twenty days of the commencement of the Chapter 11 case. Based on this, the Plaintiffs contend that these debts are presumed to be nondischargeable by virtue of § 523(a)(2)(C) of the Bankruptcy Code. The Plaintiffs also seek an award of reasonable attorney fees and costs based on *TranSouth Financial Corp. of Florida v. Johnson*, 931 F.2d 1505 (11th Cir.1991). The extraordinary facts established at the final evidentiary hearing relevant to the matter under consideration are as follows:

The Debtor in this case is a real estate entrepreneur who prior to the commencement of this case was involved in some very substantial real estate ventures. After ten years of real estate sales experience with a large, publicly traded land sales company, the Debtor began his own real estate company in 1981. In addition to real estate sales, the Debtor also became actively involved in real estate development. In 1992, the Debtor was the sole shareholder of three separate entities: Southwest Florida Realty Corp. (Southwest), Charlotte Points West (Charlotte) and Jamaica Way Corp. (Jamaica).

Both Charlotte and Jamaica owned existing, built out condominium projects, which were selling completed units. During the relevant time, the Debtor borrowed from various lending institutions, funds in excess of $1 million. Some of these loans were repaid when the condominium units were sold. Southwest acted as a broker in the sale of the condominiums sold by Charlotte and Jamaica.

In the past, the Debtor had a six-figure income. For instance, in 1990, the Debtor had taxable income of $240,000 or $20,025 per month. However, by 1992 the Debtor's income fell considerably and according to his statement of financial affairs, he had taxable income of only $38,000 for the first five months of that year. The Debtor did not receive a regular income in the conventional sense. During the relevant time, the Debtor had available funds which were derived from the repayment of loans by Charlotte and Jamaica, from loan proceeds when he refinanced the mortgages of these properties, from additional mortgage loans and from commissions earned by Southwest made on sales. In addition, the Debtor also initially received some dividend income on stocks. However, the Debtor liquidated all his stock holdings by the commencement of this Chapter 11 case.

The extraordinary facts of this case involve the Debtor's use of credit cards as a financing vehicle of his real estate business. Notwithstanding the high interest rate, the Debtor found it convenient to use cash advances on his credit cards to finance various projects, including the purchase of real estate and condominiums. The Debtors Chapter 11 schedules list some 48 credit cards (including various unsecured lines of credit) with a combined balance of $432,648.15 as of the date of filing. While this appears excessive on its face, the Debtor contends that his borrowing scheme was well established over the past six or seven years, and that his accumulated balances actually decreased in the months prior to his Chapter 11 filing.

The Debtor was apparently in the practice of running up a large amount of credit card debt while working on a project, which he paid off with the proceeds of permanent fi-

nancing once the project was completed. There was extensive testimony given at trial concerning a land transaction which was scheduled to close in early 1992 which would have provided the Debtor with $2.5 million dollars to refinance his existing real estate loans. However, this loan fell through, and the Plaintiffs assert that even if the loan had closed, the full proceeds were needed to pay off the secured debt on the property and needed capital expenditures.

In the Spring of 1992, the fortunes of the Debtor suddenly took a nose dive when an entity known as Sabbia & Monti, a Netherlands Antilles corporation, and Jim Moore filed a civil suit against the Debtor and against Charlotte, Jamaica and Southwest making criminal accusations against the Debtor concerning his activities in relation to his real estate projects. The Debtor claims that he was unaware of this lawsuit until May 24, 1992, when the story ran on the front page of the local newspaper. The adverse publicity was devastating to the debtor's businesses. Additionally, this lawsuit sought to tie up all the assets of the debtor's companies, from which he anticipated receiving funds to repay his creditors. The Debtor contends that this unexpected lawsuit, and its effect on his reputation and businesses, was the reason underlying his decision to seek the protection of the Bankruptcy Code and not his credit card debts.

The Debtor testified that he first met with an attorney on April 29, 1992 to discuss a "business problem" that he was having with Sabbia & Monti, and that he was not aware that the attorney practiced in the area of bankruptcy until after the meeting. In this connection, however, it should be pointed out the Debtor, who resides in Charlotte County, the County adjacent to Lee County which is an established Division of the Bankruptcy Court where there are practicing attorneys familiar with commercial matters and the Bankruptcy Code, the Debtor elected to visit the first attorney whose offices are in Clearwater, Florida, and who is prominently known for his expertise in the matter of Bankruptcy. It is not unreasonable to infer that the visit of a Debtor with this particular attorney was for the purpose of discussing possible reliefs under the Bankruptcy Code, contrary to the protestations of the Debtor. The attorney referred him to a second attorney who he met with on May 7, 1992, to discuss the possibility of using bankruptcy to avoid a transfer of the property involved in the dispute with Sabbia & Monti, which property the Debtor deeded to a Mr. Jim Moore on April 13, 1992. It is the Plaintiffs' contention that the Debtor had already decided to file a bankruptcy Petition not later than April 29, 1992 when he met with his first attorney and all additional charges made by him on the credit cards leaves no doubt that he had no intention to repay the same. In opposition the Debtor points out that his actual decision to file a Petition was in fact triggered by the lawsuit filed against his corporations in late May, that the fact that he sought protection under Chapter 11 also belies the proposition that he did not intend to repay these charges and also claims that neither his first attorney nor the second attorney advised him not to use any of his credit cards any longer.

Based on these facts, it is the contention of the Plaintiffs that the balance owed by this debtor should be excepted from the overall provision of the general bankruptcy discharge based on § 523(a)(2)(A) of the Bankruptcy Code which provides in pertinent part as follows:

§ 523. Exceptions to Discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The burden of establishing a claim of nondischargeability is on the party who seeks such a determination. The burden of proof is no longer the clear and convincing standard, but merely the preponderance of evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To establish a viable claim under § 523(a)(2)(A)

for abuse of the privilege granted to a credit card holder, there must be competent proof that either the card holder used the credit card knowing that he had no intention to ever repay the debt, or knowing that he will not be capable to meet the obligations incurred through the use of the card. *In .re Stokes,* 155 B.R. 785 (Bankr.M.D.Fla.1993).

The classic example of the first proposition is when the debtor consults an attorney for the purpose of filing bankruptcy and then makes charges on the credit card before filing bankruptcy. In the second scenario, the debtor's income is either nonexistent or insufficient to meet his other fixed monthly obligations and he has no realistic basis to anticipate a substantial increase in his income in the near future. The Plaintiffs in this case assert that the Debtor falls under both of these categories.

■ The facts of this case, as noted, are highly unusual to say the least. While unorthodox, the debtor has established that his practice in the past was to use his credit cards for short term financing of his real estate ventures. The record also supports the proposition that up until now, this practice enabled him to earn substantial income and arrange for the sale or refinancing of certain assets to repay these short term debts. The Plaintiffs make a convincing argument based on the schedules, facts and figures, that the Debtor's current level of income was grossly inadequate to service the level of credit card debts that he amassed. However, unlike a normal individual, the Debtor has shown that his repayment of credit card debts in the past came from sources other than income. The Debtor often received permanent financing on projects, the proceeds of which were used to pay down short term debt, including credit cards. For instance, on March 12, 1992 the Debtor had received a $700,000 mortgage on the Sabbia & Monti property, the proceeds of which he used to pay off various loans, including credit cards. While these funds were not "income" in the traditional sense, they provided a means to repay credit card debt. Based on this analysis, the court is satisfied that the Plaintiffs have failed to prove that the Debtor made charges knowing that he would be incapable to meet the obligations, at least until 1992.

■ This Court is unwilling to accept the proposition that the Debtor was not aware of the ongoing dispute with Sabbia & Monti and the real likelihood that his ability to further carry on his business on borrowed funds might be seriously threatened. The charges made, especially after he visited the attorney in April, present a totally different picture. First, these charges may carry the presumption of nondischargeability by virtue of § 523(a)(2)(C) as it relates to cash advances. There is no question that during the visits to the two attorneys, including the first one, the topic of bankruptcy was discussed as a means to recover the property deeded to Moore and the fact that he did not file his Petition for relief until May 29, 1992 would not take these charges out of the presumption of nondischargeability provided it applies. The difficulty with the applicability of the presumption and the Plaintiffs' reliance on same should be evident if one carefully considers the specific language of the Statute. The relevant language of the Statute reads as follows: § 523(a)(2)(C), "consumer debts owed to a single creditor and aggregating more than $1,000 for 'luxury goods and services' ... or cash advances aggregating more than $1,000 that are extensions of consumer credit ... within 40 days before the order for relief under this title, are presumed to be nondischargeable ..." 11 U.S.C. § 523(a)(2)(C) (1992). The Code defines "consumer debt" as "debt incurred by an individual primarily for personal, family, or household purpose." 11 U.S.C. § 101(8). Thus, to apply this exception, the record must establish with the requisite degree of proof that the debts under consideration are consumer debts and they were obtained for the purposes described in § 101(8) of the Code. On this record it is impossible to determine what purpose these funds were used but considering the past credit card activity of this Debtor it is fair to infer that they were not for the purpose of personal, family or household use but for the purpose of keeping his business enterprise alive or possibly to pay attorneys fees.

Based on the foregoing, this Court is satisfied that the Plaintiff failed to establish with the requisite degree of proof in spite of the enormous and unusual credit card use by this Debtor that the balances owed to these Plaintiffs are not within the exception of § 523(a)(2)(A) of the Bankruptcy Code.

A separate final judgment shall be entered in accordance with the foregoing.

## ORDER ON MOTION FOR REHEARING

### Aug. 28, 1995

THIS is a Chapter 7 liquidation case and the matter under consideration is a Motion for Rehearing filed by the three Plaintiffs in the above-captioned adversary proceedings. Each of the three adversary proceedings sought a determination as to whether the debts due by Wallace Hinshaw (Debtor) to Barnett Bank, American Express Centurion Bank and American Express, Optima Card Division (Plaintiffs) are nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code. On April 27, 1995, after a lengthy final evidentiary hearing, this Court entered Findings of Facts, Conclusions of Law and Memorandum Opinion concluding that the debts were in fact dischargeable. The Motion currently before the Court specifically seeks rehearing of the portion of the Findings which addresses the cash advances made within the presumption period contained in § 523(a)(2)(C). After a review of the Findings of Fact, Conclusions of Law and Memorandum Opinion, this Court is satisfied that it is appropriate to supplement the Opinion in order to clarify the analysis and the conclusion reached by this Court.

In the Findings of Fact, Conclusions of Law and Memorandum Opinion, this Court concluded that certain cash advances made by the Debtor within the twenty days prior to the filing of the Debtor's bankruptcy case were not within the presumption of nondischargeability created by § 523(a)(2)(C). According to the Plaintiffs, this court concluded that the debts incurred by the Debtor within twenty days of the filing of his bankruptcy case did not fall within the presumption contained in § 523(a)(2)(C) based upon the failure of the Plaintiffs to establish that the debts incurred were consumer debts.

It is well established that the burden of proof for purposes of § 523(a)(2)(C) is on the Plaintiffs to establish that the debts incurred fall within the presumption. In order to establish this, the Plaintiffs must show that there exists (1) a consumer debt; (2) owed to a single creditor; (3) aggregating more that $500.00; (4) for luxury goods or services; (5) incurred by an individual debtor; (6) on or within forty days before the order for relief. It should be noted that what is statutorily presumed is not the existence of any of these six elements, but the presumption is that the debtor incurred the debt without the intention to repay the obligation. *In re Koch*, 83 B.R. 898 (Bankr. E.D.Pa.1988); *In re Costantino*, 72 B.R. 189 (Bankr.D.S.C.1986); *In re Leaird*, 106 B.R. 177 (Bankr.W.D.Wis.1989). There is no obligation in the law, as is argued by the Plaintiffs, which requires the Debtor to prove that the debt is dischargeable where the Plaintiff has not made the initial showing of the applicability of the presumption contained in § 523(a)(2)(C).

After considering the record of this matter, and the Findings of Fact, Conclusions of Law and Memorandum Opinion entered by this Court on April 27, 1995, this Court is satisfied that the Plaintiffs failed to establish that the presumption contained in § 523(a)(2)(C) applied to the debts incurred by the Debtor by failing to establish that the cash advances made by the Debtor were consumer in nature. Based upon the foregoing, this Court is satisfied that the conclusion reached in the Findings of Fact, Memorandum of Law and Memorandum Opinion was correct.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Rehearing is hereby granted, and the Findings of Fact, Conclusions of Law and Memorandum Opinion is hereby clarified as set forth above.

DONE AND ORDERED.