### In re EXPRESS ONE INTERNATIONAL, INC., Debtor.

**Express One International, Inc., Plaintiff,**

v.

**Gie Balkans Bail, Defendant.**

**Bankruptcy No. 95–41189.**
**Adversary No. 97–4057.**

United States Bankruptcy Court, E.D. Texas, Sherman Division.

Nov. 9, 1999.

Marci L. Romick, Arter & Hadden, L.L.P., Dallas, TX, for debtor.

Robert G. Richardson, Jackson Walker, L.L.P., Dallas, TX, for defendant.

## OPINION

DONALD R. SHARP, Chief Judge.

Now before the Court is the Second Amended Objection to Proof of Claim No. 823 filed By GIE Balkans ("GIE"). The objection was joined with a counter claim to recover money and thereby became an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 3007. After several delays, the matter came on for hearing pursuant to regular setting. At the conclusion of the hearing, the Court granted the parties time to file briefs; after which it was taken under advisement. This opinion constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052 and disposes of all issues before the Court at this hearing.

## JURISDICTION

This is a core proceeding pursuant to 28 U.S.C. § 157, over which this Court has retained jurisdiction.

## THE BURDEN AND STANDARD OF PROOF

Federal Rule of Bankruptcy Procedure 3001(f) gives the following evidentiary effect to the filing of a proof of claim—"A proof of claim executed and filed in accordance with the rules shall constitute prima facie evidence of the validity and amount of the claim." An objecting party must produce evidence rebutting the claimant, or the claimant will

prevail. *In re WHET, Inc.*, 33 B.R. 424, 437 (Bkrtcy.D.Mass.1983). The traditional standard of proof imposed upon a creditor seeking to have its claim allowed is by a preponderance of the evidence. *In re Koch*, 83 B.R. 898, 17 B.C.D. 449 (Bkrtcy. E.D.Pa.1988). Although the burden of production shifts to the objecting party, the burden of persuasion by a preponderance of the evidence remains with the claimant: "If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence'". *Calif. State Board of Equalization v. The Official Unsecured Creditors' Committee (In the Matter of Fidelity Holding Co., Ltd.,)* 837 F.2d 696, 697 (5th Cir.1988). See also: *In re WHET, Inc.*, 33 B.R. 424, 437 (Bkrtcy. D.Mass.1983).

■■■ "Preponderance of the evidence" means: "Evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." *Braud v. Kinchen*, 310 So.2d 657, 659 (1st Cir.1975). It is evidence which is more credible and convincing than the other evidence brought. The standard is more than a "scintilla" of evidence and less than "clear and convincing". *In re Express One International, Inc.*, 229 B.R. 129, 133 (Bankr.E.D.Tex., 1999). A preponderance of the evidence means "by the greater persuasive force thereof, and not the greater volume thereof, or the greater number of witnesses testifying thereto". *Liechti v. Roche*, 198 F.2d 174, 177 (5th Cir.1952). Accordingly, it is incumbent upon GIE, whose claim has been objected to by the Debtor, to prove the extent and validity of its claims by a preponderance of the evidence.

## DISCUSSION

Express One International, Inc. ("Debtor"), filed for relief under Chapter 11 of the U.S. Bankruptcy Code. At the time of this hearing, Express One was operating as a reorganized Debtor having had their plan of reorganization confirmed earlier. The plan of reorganization provided that certain claims' objections would be litigated later and provisions were made in the plan for funds to be set-aside for payment of those claims. The instant controversy is the last major claim remaining in the case and has been one of the more contentious ones. This contested matter arises from the Debtor's objection to the unsecured proof of claim filed by GIE in the amount of $1,090,323.58 alleged to be due under that certain Aircraft Operating Lease (the "Lease") entered into by and between the Debtor and GIE pre-petition. Under the terms of the Lease, the Debtor leased a DC–10 aircraft from GIE for an initial deposit and a monthly fee of $240,-000 (U.S.) for the purpose of ferrying international tourists. The monthly fee was not predicated on the hours of usage. The Lease was for a term of 37 months and it was accompanied by a requirement that a company known as Finnair be paid for all maintenance work on the plane during the 37 month term of the Lease. The Finnair agreement is not in controversy in this case. The matter is made somewhat complicated by the fact that GIE is a French company [1] and the Lease, prepared by GIE, provides that it is to be interpreted under French law. The parties have had considerable disagreement over provisions

---

1. Actually, GIE is a French GROUPEMENT Ď INTERET ECONOMIQUE, an economic interest group. Based on the information supplied by the French law experts and the testimony adduced at the trial, it is a special purpose entity whose only function was to own and hold the aircraft in question in this controversy. The evidence indicates that it is closely equivalent to an assumed name operation with which we are familiar. The entity is a subsidiary of CAISSE NATIONALE de CREDIT AGRICOLE (CNCA) which is apparently a very large French bank. It appears from the testimony that all persons who acted on behalf of GIE were actually employees of CNCA and for all practical purposes, the actions of GIE and the actions of CNCA are inseparable.

of French law as they apply to the resolution of this dispute. Obviously, Express One was not able to perform under the Lease or there would not be a dispute to adjudicate.

Express One contends that it entered into the 37 month Lease in the belief that there was a substantial market to ferry European tourists from Europe to the United States, primarily Florida, and that the business had the possibility of being a lucrative one for the airline. This was a new and speculative venture for Express One since it was the first wide-bodied jet they operated. The Lease was negotiated during the summer and fall of 1993 and ultimately resulted in the completed agreement on or about October 13, 1993, with the first rental payment being due on December 10, 1993. Express One apparently paid the first rental payment without a problem but immediately experienced problems when the second payment became due. The expected lucrative charter contracts did not materialize, in part, because of an unfortunate attack on some European tourists in Miami which had a very chilling effect on the tourist business. Additionally, the Republic Airlines bankruptcy caused large losses to Express One and further, added to their cash flow problems. The Lease was ultimately terminated by mutual agreement of the parties in September of 1994 and the aircraft was returned to GIE. It is what happened in the interim that forms the basis of the dispute between these parties.

■ At the outset, the parties argued strenuously concerning procedural and evidentiary matters in the conduct of this trial. The parties agree that the contract requires French law to be applied to the resolution of any disputes and further agree that it is proper to apply French law. The evidentiary dispute centers around whether or not French law allows oral testimony concerning the terms of the agreement between the parties or whether the parol evidence rule (or the French equivalent thereof) prohibits any such testimony. GIE takes the position that the Lease is complete in itself and contains a provision that it cannot be altered except by written instrument and therefore, it is entitled to enforce the terms of the Lease as written. GIE further argues that it is clear that although French substantive law applies to the resolution of this dispute, the law of the forum, the State of Texas, supplies the procedural law for the conduct of the hearing. Thus, they argue it follows from that position that the Parol Evidence Rule as understood in Texas would prohibit the introduction of any oral testimony concerning the terms of a written agreement. The real controversy between the parties is whether the Parol Evidence Rule is a rule of substantive law or a procedural rule. If substantive law, then it is to be construed in accordance with French law and if procedural law, it is to be construed in accordance with Texas law. In addressing this issue, the Texas Supreme Court opined in *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30 (1958) that the Parol Evidence Rule is not a rule of evidence at all, but a rule of substantive law. *See* also *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219 (1977) and the discussion in *McCormick* and *Ray*, Tex. L.Evid.2d. Ed., § 1601. Additionally, the Fifth Circuit, applying Texas Choice of Law Rules to determine a choice of law issue, has also held Parol Evidence Rule to be a rule of substantive law rather than procedural law. *Long Island Trust Company v. Dicker*, 659 F.2d 641, n. 14 (5th Cir.1981) This Court must look to French law in this instance to determine the extent to which oral testimony can be used in the resolution of this dispute.

Contracts in France are classified as either commercial or civil. French law regards every rental of movables (movables in French Civil Law correspond to personal property in common law) and all obligations between traders, dealers and bankers to be acts of commerce. As such, these acts are controlled by the Commercial Code. The Commercial Code is a body

of specialized law to deal with commercial contracts while the Civil Code is broader in application and codifies broad general concepts of the law. It is therefore necessary to characterize the aircraft lease to determine which body of law applies. There are two separate and distinct grounds to consider this a commercial transaction. First, it is a lease of an aircraft which is a movable under French law and it is a transaction between a corporation (Express One) and a French economic interest group which is a commercial enterprise under French law. It would seem that there can be no question but that the lease in question in this controversy is a commercial transaction on both of these grounds and is therefore controlled by the French Commercial Code. Article 109 of the Commercial Code of France is the important provision of French law pointed to by both Henry Dahl and Mr. Mondolino in the evidence presented by them. That Article of the French Commercial Code embodies the French freedom of evidence principle which provides that "with respect to merchants, acts of commerce may be proved by all means unless it is otherwise provided by law." This Court has no doubt that under French law evidence of oral agreements and evidence of the subsequent conduct of the parties in carrying into effect their agreement is admissible to prove whether or not there was an amendment to the contract and the terms of that amendment.

There are two separate and distinct issues in this case. First is the question of the right of return which Express One argues was an oral agreement entered into at the time of the conception of the contract and was simply not included in the contract because of mistake or because of a belief that it was not needed under French law. The Court is convinced that the question of the right of return is really immaterial to the resolution of this dispute. It is clear that the officials at Express One felt that they had the right to terminate the Lease and return the aircraft upon proper notice at any time. It is clear that they conducted themselves in the belief that this was their right. Second is the question of whether there was a subsequent agreement reached between the parties dealing with one aspect of their business relationship. The first issue (that of the right of return) is very troubling in light of Article 1134 of the French Civil Code which provides that the terms of a contract "constitutes the law of the parties." [2] None of the evidence as to French law presented by Henry Dahl or Mr. Mondolino clearly addresses the interplay between that section of the French Civil Code and Article 109 of the French Commercial Code. Henry Dahl implies that the French Commercial Code would take precedence because of the commercial nature of the transaction and perhaps that is the case. This Court is troubled with any attempt to say that the written agreement is not the agreement between the parties but that some oral statement or understanding is an integral part of the agreement from its inception and is now enforceable in contravention of the clear words of the written contract. As stated earlier, this Court finds that issue to be immaterial to the resolution of this dispute. The second issue, which is material, deals with what the parties did subsequent to the entry into the contract which governs the relationship between them. That is the issue of whether or not the parties met on January 19, 1994, and orally modified their relationship and if so, the terms of that subsequent agreement. GIE argues that paragraph 20.9 of the Lease provides that the Lease can only be varied by a written agreement and paragraph

---

**2.** This is a concept with which this Court is well familiar because of a corresponding provision in the Louisiana Civil Code pursuant to which many years of law practice was conducted. The troubling aspect of Article 1134 of the French Civil Code is whether that could be a provision "otherwise provided by law" referred to in Article 109 of the Commercial Code.

20.4 of the Lease declares that GIE's rights against Express One are not capable of being waved or varied except by an express waiver or variation in writing. These two paragraphs of the Lease are obviously paragraphs placed in the Lease for the protection of GIE. It is axiomatic that any party not under a legal disability can wave any provision placed in any legal document for that parties' benefit. It is also axiomatic that parties can wave rights by express language or by their actions. Were we faced with a situation where Express One argues that the contract was amended and there is no evidence of an amendment except Express One's assertion, we may have a far different result. However, there is no question but that GIE has acknowledged by both their words and their actions that there was an amendment to the contract and that there has been an amendment to the contract and that those amendments were not in compliance with paragraph 20.9 or paragraph 20.4. Therefore, GIE cannot deny the existence of the amendments and does not deny that certain agreements modifying the business relationship were made between the parties on January 19, 1994, at the meeting in Paris. This issue is not controlled by Article 1134 of the French Civil Code upholding the sanctity of written contracts nor the Parol Evidence Rule under Texas law. It is not an attempt to argue that there is some unwritten provision not contained within the contract from its inception which should now be taken into consideration. It is a recognition of all parties rights to contract freely between themselves.[3] It is clear that these parties made a new agreement but now disagree over the terms of that agreement. Unfortunately, they did not reduce that agreement to writing (maybe through oversight or deliberate design) and this controversy has ensued. Neither the Texas Parol Evidence Rule or any provision of French law prohibits the parties from presenting all evidence of that agreement that they have to the Court so that the matter can be resolved after a full evidentiary hearing.

What is important to this controversy is what happened and what the parties did after the lease was signed and in carrying out the terms of the business relationship between them. GIE's argument that the contract cannot be modified except by written agreement and therefore must be enforced in accordance with its terms must fail. GIE itself admits that the contract was amended and in fact is not attempting to enforce the contract as written but is attempting to enforce the contract as they say it was subsequently modified. There is no denying that the contract was terminated far before the 37 month term specified in the written agreement by the mutual agreement of the parties. There are some documents in the form of letters and communication between the parties dealing

---

3. Insofar as French law is applicable to this agreement, it is clearly controlled by Article 109 of the French Commercial Code. The freedom of evidence rule would certainly apply between these commercial entities to allow all evidence concerning the nature of the agreement made between them on January 19, 1994, to be introduced into evidence. If one were to look to common law to resolve this problem, a comparable principle exists. An oral modification agreement may effectively modify any written contract if the new contract is not within the Statute of Frauds *Howard O. Hunter, Modern Law of Contracts.* Rev.Ed.1998. Oral modification of a contract may be found despite the existence of a "no oral modification" clause 4 *Williston on Contracts*, § 591 (3rd Ed.1961) or 6 *Williston on Contracts,* § 1828 p. 5179 (Rev.Ed.); *6 Corbin on Contracts* § 591 (1962) *See* also *Wagner v. Graziano Construction Company, Inc.*, 390 Pa. 445, 136 A.2d 82 (1957) and *Universal Builders v. Moon Motor Lodge*, 430 Pa. 550, 244 A.2d 10 (1968) As the Pennsylvania Supreme Court stated in the *Wagner* case at page 83, "The most iron clad written contract can always be cut into by the acetylene torch of parol modification supported by adequate proof ... even where the contract specifically states that no non written modification will be recognized, the parties may yet alter their agreement by parol negotiation. The hand that pens a writing may not gag the mouths of assenting parties...." *See* also *In re Franks*, 95 B.R. 346 (Bkrtcy.E.D.Pa.1989)

with the termination but no formal written amendment of the contract which terminates it. The parties entered into negotiations and tentatively agreed to terminate the contract in July of 1994 when Express One got an opportunity to ferry some troops to Malaysia and pursuant to agreement, delayed the termination through the month of August and into September. The record in this case demonstrates clearly that the parties cooperated and talked to each other concerning the method of returning the plane and keeping it insured until it could be properly returned and reinsured by GIE. It is disingenuous for GIE to now argue that the contract was not modified and must be enforced in accordance with its terms. In fact, GIE seeks no rental payment for any period of time beyond the agreed upon termination which clearly indicates that they agreed with the termination and agree that no funds are due for any period past September 24 when the aircraft was returned to them. Thus, this Court finds the issue of "right of return" immaterial. It has already been done.

The real controversy in this case deals with the six month period from January to June of 1994. Express One's position is that when it realized the tourist business would not support the Lease, it immediately requested a meeting with officials of GIE and that meeting was conducted on January 19, 1994. There is no dispute that certain agreements were made at that meeting to govern the conduct of the parties over the following six months. The controversy is that the parties take differing views of what occurred at that meeting. Express One contends that it proposed to maintain the aircraft and pay for it on an hourly basis determined by the number of hours it was actually used in each month. An arrangement commonly referred to in the industry as "power by the hour." Express One's version of the agreement is that, from the period of January through June, it would maintain the aircraft and pay a fixed fee per hour along with the appropriate maintenance charges through June and then return to the regular schedule of payments if business improved during the summer tourist season. That meeting was attended by James Wikert and Chris Chorley for Express One while GIE was represented by Pierre Casau and a representative from Finnair. The only parties to the meeting who testified at trial were James Wikert, Chris Chorley and Pierre Casau[4]. Both Mr. Wikert and Mr. Chorley supported their position that the agreement was a substitution of the power by the hour fees based on the total hours flown during a monthly period for the $240,000.00 per month in rent.

GIE's position, or at least one of its positions, is that the six month period in which power by the hour fees were being paid was a short forbearance in which the difference between the power by the hour payment and the $240,000.00 payment would not be collected but would all remain due and be paid at a later time. These funds constitute the entirety of the proof of claim filed by GIE to which Express One has objected. Express One's counterclaim seeks the return of the $240,000.00 deposit which they paid at the inception of the Lease and which was applied to the unpaid difference between the power by the hour calculation and the $240,000.00 per month regular payment called for in the Lease for the months of January and February 1994. All sums associated with the return of the aircraft and the maintenance have been paid and no further claim is made for those amounts.

4. The fact that neither party submitted deposition testimony or produced as a witness the third party to the meeting, the FINNAIR representative, weighs against both and indicates to this Court that a certain level of gamesmanship prevailed in the meeting such that perhaps both were avoiding committing the terms of their modified agreement into writing in order to be able to deny their understanding at a later date if such would be beneficial. However, the burden of proof rests with GIE.

■ This Court is convinced that it does not need to delve deeply into French law nor be sidetracked by the arguments made that the French civil law contains such unusual provisions that some different result would obtain by the application of those legal principles. This Court was educated in the civil law tradition and understands principles of law derived from the Roman law and the French Civil Code as applied in the state of Louisiana. Although terminology is different, the principles espoused by the system of law in use in the countries which subscribe to the civil law as opposed to the English common law is markedly similar in result to the legal system that is predominant in the United States. Just as the common law does not abide a party taking inconsistent legal positions, the civil law provides the same. That simple principle is fatal to GIE's position in this case. As stated earlier, GIE cannot deny that there was a modification to the contract. In fact, they do not deny that there was a modification and the exhibits and testimony of Pierre Casau clearly demonstrates that the parties met on January 19, 1994, in Paris, France and made an agreement to conduct their business differently than that provided in the written Lease signed some three months earlier. Now that they are in a dispute concerning the terms of that agreement, they cannot simply declare that the agreement did not take place and that they are entitled to enforce a portion of their earlier written agreement. The question to be determined is what are the terms of the agreement reached by the parties on January 19, 1994, at the Paris meeting.

This Court believes that Express One has demonstrated clearly that its version of the agreement is the agreement reached by the parties. There are inconsistencies in the position taken by GIE that are fatal to its case. A series of letters introduced as Exhibits 3 through 7 completely ignore the agreement of the 19th and demand payment of the difference between the power by the hour payment and the $240,-000.00 monthly payment. The first two of those letters also advise Express One that a portion of the $240,000.00 deposit is being applied to the shortfall. These demands for payment are inconsistent with what Mr. Casau claims to be the agreement in the letter of June 17, 1994, introduced as Plaintiff's Exhibit 38 where he acknowledges that the agreement between January and June 1994 was to "pay rentals calculated on a flying hour basis." Exhibit 38 also contains a provision in paragraph 2(c) that states that there was an agreement to pay the shortfall in monthly equal payments between June 1994 and June 1995. However, at trial Mr. Casau admitted that no such agreement existed but that he was simply making a proposal in order for Express One to maintain the purchase option contained in the Lease. Additionally, Mr. Casau's testimony contradicts any assertion that there was an agreement to pay the shortfall at any time. In fact, when asked at trial if at the time of the January 19 meeting GIE ever told Express One there would be a differential payment between the power by the hour and the $240,000.00 per month called for in the Lease, Mr. Casau stated "we never speak of that." He also stated in his testimony that GIE accepted Express one's proposal at the meeting.

GIE's position is further eroded by a common sense analysis of the import of the letters introduced as Exhibits 3 through 7. Given the fact that Mr. Casau, the only witness to testify for GIE, acknowledged that there was an agreement to change the rental payment on January 19, 1994, then the subsequent letters make no sense at all. In essence, the letters simply demand that the difference between the power by the hour calculation and the $240,000.00 per month be paid. That's no agreement at all and would give Express One absolutely no relief in what they believed to be a temporary cash flow problem. It is simply not logical that the officials at Express One would have gone to Paris to make an agreement to deal with the cash flow problem and then accept terms that would be

no relief to them. Mr. Casau's acknowledgment that GIE accepted Express One's proposal certainly demonstrates that these letters could not embody the agreement reached[5]. Express One certainly did not go to Paris to propose that they continue making payments that they already knew they could not make under the lease.

An additional circumstance mitigates in favor of finding that Express One's position is supported by the evidence and the circumstances that existed in the industry at the time. Mr. Wikert testified concerning the availability of planes such as the one involved here. He testified that there was a surplus capacity of these planes in the industry at the time and in fact his shorthand insider reference was that there were several wide-bodied jets "parked in the desert." A reference to the fact that idle planes are stored in the dry air of the Southwest to avoid humidity problems. The testimony further indicated clearly that GIE was anxious to make some use of this plane and that it had apparently not been well treated by its previous Lessee, Yugoslav Airlines. Mr. Casau also acknowledged in his testimony that upon the return of the Leased plane, it was released for less money than the $240,000.00 called for in the Express One Lease and that Lessee subsequently defaulted and another Lessee was found also for less money than Express One had paid. The evidence was clear that this plane was not a hot item in the aircraft industry at this time. That fact certainly gives credence to a finding that GIE would be amenable to making a reasonable agreement to avoid taking the aircraft back when it knew it would not be a sought after item on the aircraft lease market.

In short, Mr. Casau's testimony and deposition which was introduced into evidence make it clear that there was an agreement to modify the Lease. GIE simply cannot be heard to now say it could not be modified except by written agreement. What GIE is actually saying is that since Express One does not agree with its version of the January 19 agreement, it wants to deny the agreement and return to the terms of the written contract. That is simply not acceptable under any legal regime.

■ Express One has also asserted a counterclaim in this action for the return of the $240,000.00 deposit GIE applied to the difference between the power by the hour payments and the $240,000.00 per month Lease payment. Express One's theory is that the deposit was only to be drawn down in the event they were declared in default under the Lease and since they were never in default and never declared in default, GIE has wrongfully appropriated the deposit and refuses to return it. In all of the testimony and all of the pleadings in this case, there is no mention made of the fact that the deposit was any part of the oral agreement made on January 19, 1994. It simply appears not to have been mentioned at all. Therefore, this Court believes that the provisions of the written contract control as to the deposit and an analysis of the language of the contract would indicate that Express One's position is correct. The contract provides that GIE can use the deposit to cure any declared default in the Lease agreement. One will note that Exhibits 3 through 7 expressly do not provide that there is a default in the contract but carefully refer to the fact that if certain actions are not taken, GIE has the right to declare

---

**5.** One might certainly question why Express One did not take more vigorous action in response to the demand letters introduced as Exhibits 3 through 7. The explanation from the representatives of Express One is uncontradicted in that their principal contact person was Fred Williams (Casau agreed that Fred Williams was the principal contact person) and that upon receipt of these letters, they contacted him and were informed that they were simply routine demand letters designed to protect GIE's rights to the aircraft in the event they had to claim it. They were advised by Mr. Williams to disregard the notices and abide by the agreement reached on January 19.

a default. At no point in the entire relationship was there ever a declaration of default that has been presented to this Court. In addition, having found that the parties modified the payment obligation for the six month period in question, there is no evidence that Express One committed an act of default. The testimony and the evidence is clear that under the power by the hour agreement all payments were made. If all payments were made, then there was never a default and there was never a right for GIE to appropriate the deposit to its own use. Accordingly, this Court finds that Express One must prevail on its counterclaim.