Universal Builders, Inc. *v.* Moon Motor Lodge,
Inc., Appellant.

Argued January 3, 1968. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused August 5, 1968.

John G. Buchanan, Jr., with him Buchanan, Ingersoll, Rodewald, Kyle & Buerger, for appellant.

Robert E. Wayman, with him Robert A. Jarvis, S. M. Rosenzweig, Aaron Rosenzweig, and Wayman, Irvin, Trushel & McAuley, for appellee.

OPINION BY MR. JUSTICE EAGEN, July 1, 1968:

This appeal is from a final decree of the Court of Common Pleas of Allegheny County sitting in equity. Plaintiff asked the court to set aside a real estate conveyance as a violation of the Uniform Fraudulent Conveyance Act, Act of May 21, 1921, P. L. 1045, 39 P.S. §§351-363, to declare void a supplemental agreement allegedly induced by fraud, and to grant plaintiff a money decree for work done under both the supplemental agreement and the basic contract as well as for loss of profits and punitive damages. Defendant denied that there was fraud involved in either the real estate conveyance or the supplemental agreement, denied that it owed plaintiff any sum under the basic contract and supplemental agreement, claimed a set-off for uncompleted work and counterclaimed for delay damages. The court below refused the request for a reconveyance under the Fraudulent Conveyance Act, supra, refused to declare the supplemental agreement void, dismissed plaintiff's claims for lost profits and punitive damages, denied defendant a set-off for uncompleted work, dismissed the counterclaim for delay damages and decreed that defendant should pay plaintiff $127,759.54 (the balance due on the basic contract price together with extras) plus interest. Defendant appeals.

Briefly, the background facts of this case are as follows. On August 16, 1961, the plaintiff, Universal

Builders, Inc. (hereinafter Universal), entered into a written contract with the defendant, Moon Motor Lodge, Inc. (hereinafter Moon), for the construction of a motel and restaurant in Allegheny County. The contract provides, inter alia, that all change orders must be in writing and signed by Moon and/or the Architect and that all requests for extension of time must be made in writing to the Architect. The contract specifications also required that a certain proportion of a re-inforcing substance be used in the building walls. The masonry sub-contractor failed to use the specified proportion. When this defect was discovered, Moon magnified its importance, withheld from Universal a progress payment to which Universal was entitled, threatened to expel Universal from the job and thereby induced Universal to enter into the supplemental agreement. The supplemental agreement, dated March 27, 1962, provides, inter alia, that Universal will pay Moon $5000 as damages for the absence of the re-inforcing material, that Universal will perform certain additional work at no additional cost to Moon, that the date for completion of the project is extended from April 1, 1962, to July 1, 1962, and that liquidated damages at a specified rate per day will be assessed for delay.

Universal substantially completed performance on September 1, 1962, and left the construction site on October 1, 1962. After filing this suit, Universal went into bankruptcy. The trustee prosecuted this action and won a final decree in the lower court.

Before reaching the contract questions, it is necessary to consider several preliminary matters.

Moon contends that Universal has unclean hands because Joseph V. Pizzuti, an officer and executive of Universal during the performance of the contract, allegedly manufactured evidence to support Universal's

case. This is not a sufficient ground to deny Universal relief for three reasons.

First, although the manufacturing of evidence by a plaintiff certainly might bar recovery under the clean hands doctrine, see *Gaudiosi v. Mellon,* 269 F. 2d 873 (3d Cir. 1959) and *Mas v. Coca-Cola Co.,* 163 F. 2d 505 (4th Cir. 1947), in the instant case the evidence was manufactured not by the plaintiff but by an officer of the plaintiff corporation, now in bankruptcy. The attribution of one party's unclean hands to another party is not based on simple agency principles. The applicable law has been outlined by the late Judge Learned Hand: "Whenever the question has come up, it has been held that immoral conduct to be relevant, must touch and taint the plaintiff personally; that the acts of his agents, though imputed to him legally, do not impugn his conscience vicariously. Vulcan Detinning Company v. American Can Company, 72 N.J. Eq. 387, 391, 392, 67 A. 339 . . . [other citations omitted]. On principle, so far as there is any principle about the whole matter, it seems to me that a plaintiff should not be so charged. The doctrine is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy had so conducted himself as to shock the moral sensibilities of the judge. . . . The reasons which justify imputing liability to a principal for his agent's acts, whatever they are, have nothing in common with such a notion. It would be monstrous that a man's conscience should bear the sins of those he employs, however liable he may be for their acts, and a doctrine which stands upon moral wrongdoing must clear itself of that confusion, or adopt another form. While it stands upon the court's repugnance to the suitor personally, it must confine itself to his personal delinquencies." *Art Metal*

*Works, Inc. v. Abraham & Straus,* 70 F. 2d 641, 646 (2d Cir.) (dissenting opinion), cert. denied 293 U.S. 596, 55 S. Ct. 110 (1934), adopted as opinion of the court 107 F. 2d 944 (2d Cir.) (per curiam), cert. denied 308 U.S. 621, 60 S. Ct. 293 (1939). In this case, appellant offers no persuasive reasons for imputing Pizzuti's conduct to the bankrupt corporation, nor do we see any such reasons ourselves.

Second, assuming for the sake of argument that Pizzuti's conduct should be imputed to Universal, the application of the clean hands doctrine to deny relief is within the discretion of the chancellor. *Shapiro v. Shapiro,* 415 Pa. 503, 204 A. 2d 266 (1964). Where the rights of innocent parties are involved, the doctrine should be applied cautiously. See *Zweifach v. Scranton Lace Co.,* 156 F. Supp. 384 (M.D. Pa. 1957), and the doctrine should not be invoked if its application will produce an inequitable result. *Hartman v. Cohn,* 350 Pa. 41, 38 A. 2d 22 (1944). To deny plaintiff recovery in this case would result in the enrichment of Moon at the expense of innocent creditors of the bankrupt Universal. This is an inequitable result and thus we are not persuaded that the clean hands doctrine should be applied.

Third, although it has been said that the clean hands doctrine applies in courts of law as well as in courts of equity, *Olmstead v. United States,* 277 U.S. 438, 484, 48 S. Ct. 564, 574 (dissenting opinion) (BRANDEIS, J.) and Z. Chaffee, Some Problems of Equity (1950), it generally has been held that the doctrine operates only to deny equitable, and not legal, remedies. *Merchants Indemnity Corp. v. Eggleston,* 37 N.J. 114, 179 A. 2d 505 (1962); *Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 55 S. Ct. 444 (1935); 30 C.J.S., Equity, §98 at pp. 1037-38 (1965). The plaintiff in this case was granted, not a special equi-

table remedy, but only a money decree. In effect, Universal received what it would have if the action had been at law in assumpsit.* We are not persuaded that the clean hands doctrine should be applied to deny plaintiff this legal right.

Next Moon contends that Pizzuti's conduct in manufacturing evidence should disqualify him as a witness, just as if he had been convicted of perjury. If Pizzuti's testimony is completely disregarded, Universal's case against Moon collapses. Moon's argument that Pizzuti should be disqualified as a witness completely ignores the Act of May 23, 1887, P. L. 158, §4, 28 P.S. §314, which provides: "In any civil proceeding before any tribunal of this Commonwealth, or conducted by virtue of its order or direction, no liability merely for costs nor the right to compensation possessed by an executor, administrator or other trustee, *nor any interest merely in the question on trial, nor any other interest,*

---

* Since plaintiff's requests for equitable relief were denied, equity actually does not have what is sometimes called "retained jurisdiction" to grant incidental legal relief. *Cella v. Davidson,* 304 Pa. 389, 156 A. 99 (1931) ; *Ahl's Appeal,* 129 Pa. 49, 61-64, 18 A. 475, 477 (1889) ; *Lare v. Young,* 153 Pa. Superior Ct. 28, 33 A. 2d 662 (1943). This irregularity is not, however, a jurisdictional defect which we will raise sua sponte. *Carelli v. Lyter,* 430 Pa. 543, 244 A. 2d 6 (1968). Since the defendant did not either below or on appeal question whether the action should have been brought at law, we will not consider that question. E.g., *Rosenfeld v. Rosenfeld,* 390 Pa. 39, 133 A. 2d 829 (1957) ; *Randall's Estate,* 341 Pa. 501, 19 A. 2d 272 (1941). It should be noted that in this case defendant's failure to preliminarily object to plaintiff's complaint on the ground that the action should have been brought at law was not itself sufficient to waive the right to jury trial because on the face of the complaint the action properly was in equity. When it became apparent that plaintiff was not entitled to any equitable relief, however, defendant's failure to assert its right to jury trial was a waiver. See *Carelli v. Lyter,* supra at 544-45, 244 A. 2d at 7. Historically this has been the rule. See Act of June 7, 1907, P. L. §§1, 3, 12 P.S. §§1227, 1229 (now obsolete).

*or policy of law, except as is provided in section five of this act, shall make any person incompetent as a witness."* (Emphasis added.) None of the exceptions apply. See Act of May 23, 1887, P. L. §5, 28 P.S. §§315, 317, 321, 322, 323.

Finally, recognizing that it is discretionary with a court to accept or reject the testimony of a witness who is found to be lying in part, e.g., *Luckenbach v. Egan,* 418 Pa. 221, 224, 210 A. 2d 264, 265-66 (1965) and *Commonwealth v. Ieradi,* 216 Pa. 87, 64 A. 889 (1906), Moon contends that the lower court abused its discretion in not rejecting all of Pizzuti's testimony. There is no merit in this argument. The lower court certainly had sufficient grounds to exercise its discretion. It noted that Pizzuti's financial interest in the outcome of the litigation is remote. The lower court also had the opportunity to observe the witness and to compare his testimony with other evidence for purposes of corroboration. We find no abuse of discretion in the lower court's consideration of Pizzuti's testimony.

With reference to the merits, Moon urges that the lower court erred in several respects.

First Moon submits that the chancellor erred in not enforcing the contract provision that extras would not be paid for unless done pursuant to a written, signed change order.

Unless a contract is for the sale of goods, see the Uniform Commercial Code—Sales, the Act of April 6, 1953, P. L. 3, §2-209(2), as amended, 12A P.S. §2-209 (2), it appears undisputed that the contract can be modified orally although it provides that it can be modified only in writing. E.g., *Wagner v. Graziano Construction Co.,* 390 Pa. 445, 136 A. 2d 82 (1957); 4 Williston on Contracts, §591 (3d ed. 1961); 6 Corbin on Contracts, §1295 (1962); Restatement, Contracts, §407 (1932). Construction contracts typically provide

that the builder will not be paid for extra work unless it is done pursuant to a written change order, yet courts frequently hold that owners must pay for extra work done at their oral direction. See generally Annot., 2 A.L.R. 3d 620, 648-82 (1965). This liability can be based on several theories. For example, the extra work may be said to have been done under an oral agreement separate from the written contract and not containing the requirement of a written authorization. 3A Corbin on Contracts, §756 at p. 505 (1960). The requirement of a written authorization may also be considered a condition which has been waived. 5 Williston on Contracts, §689 (3d ed. 1961).

On either of the above theories, the chancellor correctly held Moon liable to pay for the extras in spite of the lack of written change orders. The evidence indicates that William Berger, the agent of Moon, requested many changes, was informed that they would involve extra cost, and promised to pay for them. In addition, Berger frequently was on the construction site and saw at least some of the extra work in progress. The record demonstrates that he was a keen observer with an extraordinary knowledge of the project in general and the contract requirements in particular. Thus it is not unreasonable to infer that he was aware that extra work was being done without proper authorization, yet he stood by without protesting while the extras were incorporated into the project. Under these circumstances there also was an implied promise to pay for the extras.

C. I. T. Corp. v. Jonnet, 419 Pa. 435, 214 A. 2d 620 (1965), does suggest that such non-written modifications are ineffective unless the contract provision requiring modifications to be in writing was first waived. That case, however, is misleading. Although it involved a contract for the sale of movable bar and

restaurant equipment, which is a contract for the sale of "goods" controlled by the Uniform Commercial Code —Sales, supra, §2-101 et seq., as amended, 12A P.S. §2-101 et seq., it overlooks that legislation, in particular §2-209, which provides: "(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party. (3) The requirements of the Statute of Frauds section of this Article (Section 2-201) must be satisfied if the contract as modified is within its provisions. (4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver. (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."

From subsection (5) it can be inferred that a provision in a contract for the sale of goods that the contract can be modified only in writing is waived, just as such a provision in a construction contract is waived, under the circumstances described by Restatement, Contracts, §224 (1932), which provides: "The performance of a condition qualifying a promise in a contract within the Statute [of Frauds or in a contract containing a provision requiring modifications to be in writing (§407)] may be excused by an oral agreement or permission of the promisor that the condition need not be performed, if the agreement or permission is given while the performance of the condition is possible, and in reliance on the agreement or permission, while it is

unrevoked, the promisee materially changes his position." Obviously a condition is considered waived when its enforcement would result in something approaching fraud. 5 Williston on Contracts, §689 at pp. 306-07 (3d ed. 1961). Thus the effectiveness of a non-written modification in spite of a contract condition that modifications must be written depends upon whether enforcement of the condition is or is not barred by equitable considerations, not upon the technicality of whether the condition was or was not expressly and separately waived before the non-written modification.

In view of these equitable considerations underlying waiver, it should be obvious that when an owner requests a builder to do extra work, promises to pay for it and watches it performed knowing that it is not authorized in writing, he cannot refuse to pay on the ground that there was no written change order. *Focht v. Rosenbaum*, 176 Pa. 14, 34 A. 1001 (1896). When Moon directed Universal to "go ahead" and promised to pay for the extras, performance of the condition requiring change orders to be in writing was excused by implication. It would be manifestly unjust to allow Moon, which mislead Universal into doing extra work without a written authorization, to benefit from non-performance of that condition.

Next Moon submits that the lower court erroneously dismissed its counterclaim for delay damages. The lower court denied Moon any recovery for the delay because it resulted from Moon's own acts in ordering many changes. There is authority for this position. *E.g., Hood v. Meininger*, 377 Pa. 342, 350, 105 A. 2d 126, 130 (1954) (cited by lower court); *Pittsburgh Iron and Steel Engineering Co. v. National Tube Works Co.*, 184 Pa. 251, 39 A. 76 (1898); *Lilly v. Person*, 168 Pa. 219, 32 A. 23 (1895). In this case, however, the contract expressly conditions the allowance

of any time extension on the submission of a written request to the Architect. This condition specifically applies to delays caused by the owner's, i.e., Moon's, own acts. Article 18 of the General Conditions provides: "If the contractor be delayed at any time in the progress of the work by any act or neglect of the Owner or the Architect, or of any employee of either, or by any separate contractor employed by the Owner, or by changes ordered in the work . . . then the time of completion shall be extended for such reasonable time as the Architect may decide. No such extension shall be made for delay occurring more than seven days before claim therefor is made in writing to the Architect. . . ."

Consequently the case authority on which the lower court based its decision is not controlling.

The evidence that Universal conformed with the procedure required by Article 18 is slight; what evidence there is has been largely discredited. However a condition precedent such as the one contained in Article 18 can of course be waived, 3A Corbin on Contracts, §756 at 507-08 (1960), and there is evidence to support at least a partial waiver.

By executing the Supplemental Agreement (which extends the time of substantial completion from April 1, 1962, to July 1, 1962) without reference to the procedure established by Article 18, Moon certainly waived Article 18 with reference to that extension. It is not apparent, however, that this waiver applies to subsequent delays. Apart from the execution of the supplemental agreement, there is no evidence that Moon expressly or impliedly promised that the condition precedent contained in Article 18 would not apply to subsequent delays. We think it does so apply.

With reference to the assessment of delay damages, we agree with the lower court that the liquidated damage provision in the supplemental agreement is void.

Consequently, Moon is entitled only to the actual damages caused by the delay from July 1, 1962 (the date set for completion in the Supplemental Agreement) to September 1, 1962 (the date when the contract was substantially completed). This is computed as follows:

$69,869.   (The loss of earnings attributable to the delay of five months from April 1, 1962 to August 31, 1962, according to Moon's Exhibit L, prepared by Arnold I. Levine, C.P.A. of J. K. Lasser & Co., Pittsburgh, Pa.)

X 2/5ths   (Representing the two month delay)

------

$27,946.60

-- 5,000.00   (check of July 5, 1962, given by Universal to Moon as delay damages)

------

$22,946.60

Finally, we have carefully considered the record and we agree with the lower court that there was sufficient evidence to establish the amount of Universal's claim for extras and that there was not sufficient evidence to establish Moon's set-off claim for uncompleted work.

The decree of the lower court therefore was correct, except insofar as it failed to allow Moon's counterclaim for delay damages, as before indicated, for the period from July 1, 1962, to September 1, 1962.

Decree vacated and record remanded for entry of a decree consonant with this opinion. Each party to bear own costs.

------

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I believe an injustice is being done the defendant in this case. The lower court awarded the plaintiff

$42,283.29, for extras, but the record shows that only $900 of such extras was earned on two signed change orders agreed to in writing. Yet the agreement specifically provides that, except in an emergency endangering life or property, no claim for an addition to the contract price was to be valid unless the work was done pursuant to the owner's written, signed order, and after written notice given by the contractor before proceeding with the work. I am disturbed that the Majority could have reached its conclusion when the record shows that *there was no such writing.*

Even the plaintiff did not contend that the requirement in writing was waived by agreement of the parties, as in *Wagner v. Graziano Construction,* 390 Pa. 445, relied upon by the Majority. The most that the plaintiff has shown are oral modifications of the work called for under the contract, which is exactly what is prohibited by the solemn agreement entered into between the parties. The oral modification certainly cannot be used as evidence of a waiver, for otherwise, a requirement of writing would become meaningless. This Court clearly pointed out this fundamental proposition of law in *C.I.T. Corp. v. Jonnet,* 419 Pa. 435, 438, where this writer, speaking for the Court, said: "Nowhere, however, do the defendants allege cancellation by the plaintiff of the express term of the original conditional sale contract that 'no waiver or change in this contract or related note, shall bind such assignee (in this case, the plaintiff) unless in writing signed by one of its officers.'

"This specific condition stands as a stone wall in the path of the defendants' contention. However, they believe they have found a way around this formidable barrier by citing the case of Kirk v. Brentwood M. H., Inc., 191 Pa. Superior Ct. 488, 492 where the Superior Court said that 'Even where the written contract pro-

hibits a non-written modification, it may be modified by subsequent oral agreement.' This is true but there must first be a waiver of the requirement which has been spelled out in the contract. Otherwise, written documents would have no more permanence than writings penned in disappearing ink. If this, the defendants' argument, were to prevail, contractual obligations would become phantoms, solemn obligations would run like pressed quicksilver, and the whole edifice of business would rest on sand dunes supporting pillars of rubber and floors of turf. Chaos would envelop the commercial world."

The lower court, in reaching its conclusions, relied in part on a certain letter, but this letter, by its reference to one of the signed change orders, clearly refutes rather than supports any agreement to cancel out the requirement of writing. Nor was there sufficient evidence to support the award for the extras. Pizzuti, plaintiff's secretary-treasurer and only full-time officer, testified that the extra costs were incurred in the amounts shown on change order forms which were not signed by the defendant and which were prepared by the plaintiff away from the job site and presented for the first time during court conciliation attempts. The evidence failed to show that the work charged for was actually performed and that an extra cost was incurred thereby, nor was there a showing of the exact amount involved. Further, there was no evidence as to what labor and material were used in excess of what was required under the original plans. There was no breakdown whatever with accompanying proof to support the plaintiff's claim for extras or that its figure had awarded the defendant proper credit for the items charged in the original contract and later changed and charged as extras.

It was the plaintiff's duty to support its claim for extras with competent evidence which in my opinion it wholly failed to produce. I cannot, therefore, go along with the Majority's conclusions as to recoveries to be permitted. And I am perplexed as to why the Majority denies the defendant credit for the cost of completing the work left unfinished by the plaintiff. The court below held that the figure of $15,564, testified to by defendant's expert, did not take into account the 1962 rates of labor and material which were 15% lower; but even if the $15,564 was reduced by 15%, the defendant would still be entitled to a $13,229 credit.

As to damages due the defendant for the plaintiff's five months' delay in the completion of the motel, Arnold I. Levine, CPA, resident partner of J. K. Lasser and Company, testified that the delay amounted to $456.67 a day or a loss of not less than $69,869. Pizzuti claimed excusable delays of 59 days and the architect, Roberts, testified to a delay of 76 days. Therefore, even if the 76 days are deducted from the $68,869 (which figure was not contradicted by any testimony to the contrary) defendant would still be entitled to $35,620.-26 less the $5,000 agreed to as delay damages in the supplemental agreement, or a net of $30,620.26.

Though the credibility of witnesses is ordinarily a matter left within the chancellor's determination, I cannot escape concluding that the chancellor in this case abused the discretion vested in him when he chose to grant such a large award to the plaintiff corporation on the testimony of its principal officer who had given to the court admittedly forged documents and testified falsely with regard to those documents. However, as before stated, even if his testimony were entitled to some probative value, it was insufficient to support the plaintiff's claims for extras and to defeat

the defendant's credit for unfinished work and delay damages.

Accordingly, I would only allow the plaintiff corporation to recover the balance due on the original contract of $91,590 less undisputed credits of $6,113.75 and less $13,229 credit for unfinished work and less $30,620.26 as damages for the delay in making the motel available to defendant for use, or a total of $41,626.99. It is my opinion that the plaintiff wholly failed to support its claim for extra work by credible, competent and sufficient evidence and the burden of disproving extras should not have been placed upon the defendant as in effect it was. The defendant's evidence, to the contrary, in support of its claim for credit for unfinished work and for damages for the delay in having the motel available for occupancy, was credible, competent and sufficient in support thereof. Thus I believe it was a gross abuse of discretion on the part of the court below to deny the defendant such credits. Where the court was too lenient with the plaintiff, it was too strict with the defendant.

Thus I would modify the decree of the court below in accordance with what I have here written.

Mr. Chief Justice BELL joins in this dissenting opinion.