361 A.2d 762

**APCL & K, INC.**

v.

**RICHER COMMUNICATIONS, INC., Appellant.**

Superior Court of Pennsylvania.

June 28, 1976.

Butera & Delwiler, Clarke F. Hess, King of Prussia, for appellant.

Joseph A. Ryan, Paoli, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

This appeal arises from a jury verdict in favor of plaintiff (appellee herein) in the amount of $38,869.19 based upon its agency contract with defendant-appellant. Principally, appellant challenges the trial court's direction of a partial verdict for appellee in the amount

of $27,297.19.[1] For the reasons which follow we agree that the court improperly removed one issue from the jury's consideration and, with respect to that issue and the damages attributable thereto, we must remand for a new trial. The relevant facts are as follows:

Appellant is the owner of a Philadelphia FM radio station (call-lettered WIOQ). Appellee is a Philadelphia-based advertising agency formerly employed by appellant to help boost "listenership" of WIOQ by advertising the radio station in the various print and broadcast media in the Philadelphia area. The written contract evidencing the agreement was signed in April, 1972, although the agreement was effective as of March 22, 1972. Quite complete in most respects, the writing contemplated providing all of the usual services of an advertising agency in an effort to promote WIOQ. Because of the inordinate amount of time and effort spent in the initial stages of an advertising campaign, the agency would not agree to organize such an advertising campaign for a client unless, in addition to payment for labor, material, talent and money expended, the client were willing to retain the agency under a one-year contract with a promise on the part of the client to generate $30,000 in additional income for the agency. Typically, a client (such as WIOQ) might generate such income as follows: Advertising agencies receive special discounts, usually 15 percent, on advertising time or space purchased from the media. In placing an advertisement through use of an agency, a client pays to the agency the fee he would pay if he purchased the time directly from the medium. The agency takes 15% of that sum as a commission and passes the balance on to the medium. Hence, while it costs the client nothing extra, he generates income for the agency by

1. The entire amount claimed to be due under the terms of the contract was $71,124.94 less a $25,000 credit for a payment made by appellant, and offset by $3,049.94 of income generated for the agency through advertising invoices as explained in the text of the opinion below.

using its services to purchase advertising for his product, radio entertainment in the instant case. Rather than bill this $30,000 representing expected profits in a lump sum, the agency prorated the guaranty at $2500 per month for the year, with credits entered and carried over when advertising revenues exceeded the $2500 monthly allocation. Thus, under the agreement here in question, practically speaking, appellant agreed to purchase approximately $200,000 worth of advertising during the contractual year. To the extent that the client fell short of that target, he paid the agency 15 percent of the difference.

With respect to appellant's paying the costs necessarily involved in formulating a coherent advertising campaign, including the agency's internal costs arising from the use of its personnel, the contract uniformly provided that appellant's prior approval of expenses was required before they were to be incurred by the agency; that is to say, appellant was only required to pay "per estimates agreed on in advance." Primarily, the reason for the instant dispute is not that the costs incurred and fees charged by the agency for the advertising campaign were unreasonably high, but rather that they were too expensive for appellant's budget, so that, had appellant known the costs in advance, it would have requested a less ambitious and less costly venture.

The only evidence concerning this issue revealed that on several occasions during the initial stages of the relationship between appellant and appellee, the parties met and discussed possible ideas for promoting the radio station on television stations and in news media for the purpose of increasing its listenership. Once the format and media were agreed upon the agency went ahead with production and placed the advertisements on television and in newspapers, The agency then billed WIOQ for the costs of the campaign. The bill for April, 1972 was $46,154.48, and the bill for May was $5,248.26. Appellant was surprised that the costs of the campaign for

advertisement and that the agency's internal costs and fees were so high, and requested an itemized invoice. Although the itemized invoice did not particularize all the costs and expenses involved, it did indicate that the agency spent more than $14,000 to produce the commercials.[2] This was a figure which appellant immediately disputed.

The testimony at trial conflicted concerning any prior discussion of the cost of the campaign. Two officials for appellant who were present at meetings between the parties prior to launching the campaign testified that they asked for cost estimates and were given sums considerably below the amounts of money ultimately charged.[3] On the other hand, witnesses for the agency stated that no estimates of costs were discussed at any of the meetings between the parties. Even if the testimony of the agency's witnesses is to be believed, however,[4] it would not obviate the question of whether appellant was entitled to approve expenditures and other costs before they were incurred. Therefore, we find that it was improper for the trial court to determine what amount of money was in dispute under the theories advanced by appellant here and in court below. Appellant's liability for the costs of the campaign was a question for the jury.

Under the express terms of the instant contract, appellant's obligation to remunerate appellee for costs and expenses incurred by the latter in advertising

2. Production costs refer only to those expenses incurred in putting the format and ideas which the agency created and the radio station approved into a form which could be used by the media.

3. For example, Mr. Butera, a director and stockholder of the corporation, testified that the agency told him that the gross cost of the proposed campaign would be $30,000, while Mr. Richer stated that production costs alone were only estimated to be $5,000–$6,000.

4. Obviously, in directing a partial verdict for appellee, the trial court, in essence, ruled that Mr. Butera's testimony (note 3, supra) was not to be considered by the jury.

appellant's radio station on television and in the news media was conditioned upon the station's approval of those expenses before they were incurred. In this regard, this situation is analogous to construction contracts where the parties generally agree that additional work may only be done with the prior written approval of the owner or his architect or agent. See generally 3A Corbin on Contracts § 756 (1960); 8 P.L.E., *Contracts,* § 275. While such conditions may be waived or excused by the circumstances or conduct of the parties, the contractor may not recover for extras where he has failed to show either the occurrence of the condition of prior approval, its waiver or excuse. See *Brandolini v. Grand Lodge of Pa.,* 358 Pa. 303, 56 A.2d 662 (1948). However, the courts allow a waiver or excuse to be readily inferred when not to do so would involve a "forfeiture" by one party and a "windfall" to the other. See *Universal Builders, Inc. v. Moon Motor Lodge, Inc.,* 430 Pa. 550, 557–58, 244 A.2d 10 (1968). See also Murray on Contracts § 712 (1974). In addition, unless plaintiff formally moves to amend his complaint, he may not prove that a condition has been waived or excused if his complaint avers that all conditions have occurred, because the deviation between pleading and proof under those circumstances is deemed to be fatal. *Id.* at 765. See also *Zeller v. Wunder,* 36 Pa.Super. 1 (1908).[5]

The difficulty with the instant case is that plaintiff-appellee never expressly averred fulfillment of the condition of prior approval of expenses, nor did its proof show that the condition had been fulfilled. Appellee only demonstrated that appellant approved the advertising format, without any discussion of its estimated cost. Perhaps it may be inferred that appellant, given its pre-

5. Of course, in this day of liberally granted motions to amend pleadings, even a motion to amend made during trial is permissible if, in the discretion of the court, such amendment would not be prejudicial to the defense. Pa.R.C.P. 1033. See also 3 Standard Pa.Practice 665 (1952).

sumed knowledge of the advertising business, tacitly agreed to pay for the campaign at a "reasonable cost," or waived or excused the condition of prior approval by not inquiring into the cost of the campaign. However, whether appellant's conduct could be so characterized was a question for the jury. Appellant's evidence indicated that the total cost of the campaign was estimated at $30,000, and that production costs were estimated at $5,000 or $6,000.[6] Had the jury believed this testimony, they may have returned a substantial smaller verdict for appellee with respect to the campaign costs. Hence, it was error for the trial court to direct a verdict for appellee with respect to the advertising campaign expenditures simply because their reasonableness was not disputed. The question rather was whether those expenditures, reasonable or not, were approved, or whether the condition of prior approval was waived or excused.

On the other hand, we find no error in the lower court's directing a verdict for appellee with respect to the $30,000 of promised profits, less appellant's payment of $25,000. The agency agreement between the parties expressly provided for a term of one year, terminable thereafter by either party upon ninety-days written notice. Appellant contends, however, that after the dispute over the advertising costs had crystallized, and no later than October, 1972 when the parties last corresponded, appellee should have treated the contract as terminated and should have sought to "mitigate damages." Under any interpretation of the contractual status of the parties after October, 1972, appellant's argument concerning mitigation of damages must fail. Appellant offered no evidence whatsoever that appellee had the opportunity or ability to mitigate. The general rule is that the burden of proof rests with the defendant to show that the plaintiff could have minimized his damages by us-

6. See note 2, supra.

ing the ordinary care of a reasonable and prudent person. D. Dobbs, Remedies 189 (1973). 5 Corbin on Contracts §§ 1039 & 1041 (2d ed. 1964).[7] The mere assertion of the "partial defense" of mitigation of damages is no substitute for proof that the opportunity to mitigate existed.

Hence, the trial court properly directed a verdict on the guaranteed-profit, installment payments which fell due after October, 1972. The judgment entered for plaintiff-appellee must be reduced to $5,000 (representing the $30,000 profit guaranty less appellant's $25,000 payment on account). The case is remanded for a new trial to determine whether defendant-appellant is liable on the contract for any or all of the advertising campaign costs and fees incurred and, if so, to determine the extent of any set-off to which appellant might be entitled for purchasing advertising time and space through the advertising agency.[8]

It is so ordered.

7. Indeed, the clear weight of the evidence tended to show that the $30,000 profit guaranty was part of the bargained-for exchange for the agency's intense efforts in organizing and effectuating a productive advertising campaign. That payments were prorated at $2,500 per month simply for the convenience of the client does not compel a different conclusion.

8. The alternate theory of unjust enrichment was not pleaded in the complaint. See Pa.R.C.P., Rule 1020. See also 1 Goodrich-Amram § 1020(c)–1.