## In re Anonymous No. 33 D.B. 93

Disciplinary Board Docket no. 33 D.B. 93.

PARIS, *Member,* September 5, 1995—

## I. HISTORY OF PROCEEDINGS

Respondent, [    ], was admitted to practice law in the Commonwealth of Pennsylvania in 1981. Respondent's office is located at [    ].

On April 8, 1993, Office of Disciplinary Counsel filed a petition for discipline charging respondent with violating various Rules of Professional Conduct. The allegations of misconduct arose in connection with respondent's handling of a partnership dissolution. Specifically, the petition avers that respondent, without authorization, communicated with an adversarial party he knew to be represented by counsel, gave knowingly false and misleading statements to third parties, made false statements of material fact, via the filing of certain

pleadings, to a tribunal and acted as an advocate in a proceeding where he was likely to be called as a material witness.[1]

The respondent filed an answer on April 19, 1993, denying that his conduct violated the Disciplinary Rules.

On April 29, 1993, the matter was referred to Hearing Committee [    ], chaired by [    ], Esquire and included Members [    ], Esquire and [    ], Esquire.

A hearing was held on June 18, 1993 and concluded on June 24, 1993. The parties stipulated to certain facts pertaining to the underlying partnership matter and to the testimony of witnesses regarding the main partnership asset, a parcel of real estate located on [    ] Street in [    ], Pennsylvania.

At the conclusion of the presentation of evidence, oral argument was suspended in lieu of the parties' submission of briefs outlining their respective positions on the issues.

Approximately six months after filing his brief, respondent moved to dismiss, citing the delay of the Hearing Committee in submitting its report and recommendation for discipline. The motion was denied.

On June 13, 1994, the Hearing Committee filed its report. Concluding that Disciplinary Counsel met its burden of proof on six of the eight rule violations alleged in the petition, the Hearing Committee recommended that respondent be placed on a one-year probation subject to conditions, including the assignment of a practice monitor.

---

1. The petition was later amended at oral argument. The amendment was not of a substantive nature.

Respondent filed a brief on exceptions to the Hearing Committee report to which petitioner responded. A panel of the Disciplinary Board, chaired by Gerald C. Paris, Esquire and including Members Patricia S. McGivern, Esquire and Penina K. Lieber, Esquire, heard oral argument on the matter.

The matter was adjudicated at the September 29, 1994, meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## II. FINDINGS OF FACT

Based upon the documentary and testamentary evidence, the findings of the Hearing Committee, the exceptions thereto, and the argument before the board, we find the following facts:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was born in 1955 and was admitted to the practice of law in the Commonwealth of Pennsylvania in 1981. Respondent maintains an office located at [    ].

(3) In or about March 1985, respondent's client, [A], at that time represented by different counsel, commenced a civil action against [B], who was his business partner. The action sought dissolution of the partnership

and was filed in the Court of Common Pleas of [    ] County, Pennsylvania, at G.D. no. [    ].

(4) Respondent assumed representation of [A] in May 1986.

(5) Before the resolution of the action, respondent relocated outside the [    ] area. On September 22, 1988, [C], Esquire, entered his appearance, along with respondent, on behalf of [A] in the dissolution proceeding.

(6) Sometime during the course of the partnership dissolution action, Attorney [D] entered his appearance as counsel of record for [B] and represented [B's] interests throughout its disposition.

(7) In February 1990, [B] and [A] entered into a written settlement agreement which had been negotiated by Attorney [C] on behalf of [A] and Attorney [D] on behalf of [B].

(8) Among other things, the settlement agreement provided that the partnership properties located at [    ] Street and [    ] Street, [    ], Pennsylvania be listed for sale on a declining sales price acceptance basis.

(9) The settlement agreement also required [B] to provide monthly accountings to [A's] counsel relating to disbursements and receipts of the partnership business, pending its dissolution or liquidation.

(10) With respect to the listing of the properties located at [    ] Street and [    ] Street, [A] and [B] agreed as follows:

"The properties located at [    ] Street and [    ] Street shall be listed for sale together. The parties do hereby agree amongst themselves that they will accept any offer on the premises which is $65,000 or greater. In the event that no offer for $65,000 is received within

four months of the original listing date, then the parties do hereby agree that they shall adjust the listing price as may be mutually agreeable to them. They further agree that they shall be bound to accept any offer of purchase in the amount of $60,000 or greater after the expiration of four months from the date of listing the premises and that at the expiration of each successive four-month period after the original date of listing, the parties agree to reduce the amount which they will ultimately accept for the sale of the premises by $5,000 except that neither party shall be obligated to accept any offer lower than $50,000 unless both of the parties shall agree thereto." (Petitioner's exhibit "2.")

(11) Between the date of the February 16, 1990 settlement agreement and April 1991, the respondent returned to active practice in [    ] County and resumed active representation of [A's] interests in the partnership dissolution matter.

(12) On or about April 15, 1991, the respondent prepared a petition to enforce the February 16, 1990 settlement agreement on behalf of [A] alleging inter alia:

"(a) [B] had failed to furnish [A's] counsel with the required accounts of the partnership business;

"(b) [B] had failed to take the steps necessary to assure the listing for sale of the partnership real estate, including the [    ] Street property."

(13) The petition to enforce settlement agreement was resolved out of court.

(14) On or about April 24, 1991, respondent on [A's] behalf, executed a property disclosure statement relating to the [    ] Street property. The statement set a sales price for the [    ] Street property at $100,000, an as-

sessment value of the property at $80,000, the monthly rentals for various units located within the property and designated a gross annual income from the property as $14,340. The property disclosure statement also describes the [   ] Street property as follows: "Good potential—needs renovation—income will increase proportionately." (Respondent's exhibit "6.")

(15) By correspondence dated May 22, 1991, executed listing agreements for the partnership properties, including the [   ] Street property, were returned to [E] Real Estate by [D], counsel for [B].

(16) At some point after the listing of the [   ] Street property, respondent and [D] agreed that respondent would be permitted to contact [D's] client, [B], for the sole purpose of requesting information concerning the status of certain partnership debt. However, [D] directed respondent to refrain from discussions concerning any other substantive matters.

(17) By correspondence dated July 15, 1991 and August 10, 1991, [B] communicated various matters concerning the partnership business to respondent.

(18) By correspondence dated August 16, 1991, respondent communicated directly with [D's] client, [B], with respect to various partnership matters.

(19) By correspondence dated August 26, 1991, [B] communicated directly with respondent with respect to other substantive issues concerning the partnership dissolution. (Respondent's exhibit "10.")

(20) On or about August 29, 1991, respondent prepared a second petition to enforce settlement agreement and for the imposition of sanctions against [B] and served same upon [D] as counsel for [B].

(21) The petition to enforce settlement and request for the imposition of sanctions cited [B's] failure to cooperate in the listing and sale of the partnership real estate, his failure to provide required accountings and his failure to perform agreed upon duties as the manager of the partnership assets.

(22) By correspondence to [D] dated September 19, 1991 and September 26, 1991 respondent articulated [B's] failure to manage the partnership properties responsibly.

(23) Respondent's petition to enforce settlement and for imposition of sanctions was presented to Judge [F], Court of Common Pleas of [    ] County, on September 13, 1991. Judge [F] set the matter for an evidentiary hearing.

(24) By correspondence dated October 14, 1991, [D] advised respondent that a motion to reschedule the hearing set on respondent's petition to enforce would be presented on Wednesday, October 16, 1991 at 9:30 a.m.

(25) The October 14, 1991 communication from [D] to respondent specifically references allegations that respondent had violated [D's] earlier directive with respect to contact with [B], and directed respondent to "cease and desist from any contact with [B]." (Petitioner's exhibit "D.")

(26) In early October 1991, respondent was contacted by a real estate agent named [G] of the [H] Organization relative to an offer on the [    ] Street property being made by [I]. An offer of $45,000, subject to certain conditions precedent, was extended to respondent for the purchase of the [    ] Street property. This offer

was rejected by respondent on the part of both [A] and [B].

(27) Thereafter, on or about October 11, 1991, respondent was contacted by [J], an agent of [K] Company, on behalf of another potential buyer for the [   ] Street property, [L].

(28) On October 15, 1991, the respondent had direct contact with [B] relative to a $50,000 [L] offer on the [   ] Street property.

(29) Also, on October 15, 1991, respondent had a telephone conversation with [J] relative to a $55,000 counter-proposal for the sale of the [   ] Street property.

(30) By correspondence dated October 15, 1991 from respondent to [J], respondent advised:

"As per our telephone conference of this date: you may inform your contact, [L], that the referenced property, upon which she tendered a written offer dated October 11, 1991, may be settled for $55,000. Kindly notify me in writing if this offer is acceptable." (Respondent's exhibit "17.")

(31) By letter dated October 15, 1991, following a brief meeting between [J] and respondent, [J] requested that a $55,000 counteroffer be extended by written contract by the sellers.

(32) On October 16, 1991, at the time Attorney [D] presented a motion for continuance on the petition to enforce, respondent and [D] discussed the $55,000 counteroffer on the [   ] Street property and respondent's discussions with [D's] client, [B].

(33) Respondent was advised by [D] that the $55,000 price might not be acceptable to [B].

(34) On October 16, 1991, respondent realized that there would be difficulties with the entry of a contract to sell the [    ] Street property for the $55,000 price and acknowledged that a valid contract to sell at $55,000 had not been formed at that point.

(35) Following the October 16, 1991 conversation between respondent and [D], respondent hand delivered a letter dated October 16, 1991 to [D] providing in pertinent part:

"As per our discussion of this date:

"In the event an offer of $55,000 is forthcoming, [A] agrees to presently direct the proceeds of the sale of the property at [    ] and [    ] Streets, [    ] in accordance with the provisions of the February 1990 agreement.

"If I receive no written notice from you to the contrary, I will presume that $55,000 will effect the sale of the subject property." (Respondent's exhibit "19.")

(36) In response to the October 16, 1991 correspondence from respondent, [D] replied:

"I write to reiterate what I told you in court this morning. I have never, ever, authorized you to communicate any counteroffer with respect to the [    ] Street property. When I spoke to you on the phone yesterday, I clearly informed you that [B] was unable to evaluate the merits of any deal to sell the property until an assurance was obtained that [A] would abide by the settlement agreement he entered into. Your position that my statements indicated a willingness to go along with a $55,000 counteroffer are nothing short of fantasy.

"With respect to your hand delivered letter of this afternoon, any presumption you care to make concerning [B's] position with respect to an offer which may or may not be communicated must be made at your own risk. [B] reserves the right to evaluate and provide a written response to all offers. The arrangement proposed in the last paragraph of your letter is unacceptable.

"Your own conduct requires me to proceed in this manner." (Respondent's exhibit "20.")

(37) On October 17, 1991, respondent was contacted by phone by [M], attorney for [L], and was advised that [L] was accepting respondent's offer to purchase the [    ] Street property for $55,000.

(38) The October 17, 1991 telephone conversation between Attorney [M] and respondent regarding acceptance of the offer is documented in correspondence from Attorney [M] to respondent dated October 18, 1991, with a copy sent to [D].

(39) In response, [D] issued two letters from his office dated October 21, 1991; the first to Attorney [M] indicating that respondent did not represent [B] in any matter involving the [    ] Street property and that questions concerning [B's] position with respect to the [    ] Street property be directed to [D]. The second correspondence from [D] advised respondent that [D] never received a copy of the $55,000 counteroffer; and that respondent was not authorized by [D] to make the counteroffer. Thus, informed [D], [B] would not be bound by any agreement made by respondent with respect to the [    ] Street property.

(40) In response to the October 21, 1991 letter from [D], respondent forwarded a letter dated October 21, 1991 to [D] which provides in pertinent part:

"The referenced letter—containing my counteroffer to the offer of [L]—was delivered after conferring with [B] vis-a-vis the sale of the [    ] Street property. The counteroffer was made with his approval.

"If [B] fails to honor what is on its face a valid agreement for the sale of the subject property, he will be held accountable therefor." (Petitioner's exhibit "J(1).")

(41) At the time respondent issued the October 21, 1991 correspondence to [D], he did not have a formal written agreement of sale to be executed by either [A] or [B].

(42) On October 21, 1991 respondent received by facsimile transmission a proposed agreement executed by [I] relative to the [    ] Street property from real estate agent [G], the [H] agent by whom respondent had been contacted approximately two weeks before.

(43) The [I] agreement apparently executed by [I] on October 18, 1991, set out a proposed purchase price of $57,000 without conditions other than the requirement that all security deposits be turned over to the buyer at the date of closing.

(44) This same agreement was communicated by facsimile transmission to the office of [D] on October 21, 1991.

(45) By letter of October 22, 1991, [D] replied to respondent's October 21, 1991 letter. In pertinent part, this October 22, 1991 letter from [D] provides:

"(a) That [B] never authorized respondent to sell partnership properties at any price;

"(b) That respondent was not authorized to speak to [B] concerning the sale of partnership property;

"(c) That [D] had advised respondent on October 15, 1991, the day on which the offer was communicated, that his client was not in a position to evaluate any sales offers at that time;

"(d) That the October 15 communication between [D] and respondent had been reiterated at the time of the October 16, 1991 court proceeding and confirmed by the October 16, 1991 letter from [D] to respondent that had been hand delivered to respondent on that date;

"(e) Acknowledged the receipt of the $57,000 [I] offer; and

"(f) Outlined intention to contact Attorney [M] to determine if [L] would be willing to top her offer."

(46) By correspondence dated October 24, 1991 from Attorney [M] to respondent, a proposed written sales agreement for the [   ] Street property relating to the $55,000 counteroffer was transmitted.

(47) The agreement of sale prepared by Attorney [M] was sent to Attorney [D] by respondent together with correspondence dated October 29, 1991, setting a closing date on the [M]/[L] agreement for November 15, 1991.

(48) The [M]/[L] agreement of sale and purchase contained an additional condition that voids the agreement in the event the existing leases on the [   ] Street property were not acceptable to the buyer.

(49) The written agreement of sale was neither executed by [B] nor returned to respondent.

(50) On or about November 6, 1991, respondent directed correspondence to [N], Department of the City

Treasurer, [    ] relative to the removal of the [    ] Street property from the City of [    ] tax sale list.

(51) In the correspondence to [N], the respondent stated:

"As per our telephone conference of this date:

"Be advised that a contract exists to convey the noted property at a realty sale closing set for November 15, 1991. At that time the obligations due the city will be attended to.

"I would therefore ask you to remove the subject property from the list of those now scheduled for sale on November 8, 1991." (Respondent's exhibit "30.")

(52) Also on November 6, 1991, respondent sent correspondence to [D] relative to the tax sale of the [    ] Street property and requested that [D] notify him in writing if [D]was going to refuse to honor the [M]/[L] contract for sale so that he could make the appropriate provisions.

(53) On November 15, 1991, respondent appeared for a closing on the [    ] Street property under the purported [L] agreement.

(54) Although no closing took place on that date, questioning of respondent by [M] with respect to the particulars of the [L] agreement, was recorded.

(55) According to the unsworn transcript of this proceeding, after indicating that he had had the authority on behalf of [B] to communicate the $55,000 counteroffer, respondent was questioned by Attorney [M] as follows:

"[M]: And that counteroffer was accepted through our correspondence dated October 18, 1991?

"[Respondent]: That was my impression." (Exhibit "A" to petitioner's exhibit "O.")

(56) Responding to further questioning by Attorney [M], respondent provided the following information:

"[M]: Let me ask you this, [respondent]: Did you receive our acceptance prior to any knowledge coming from [B] or his counsel that they were not willing to accept that $55,000?

"[Respondent]: I do not at this moment recall the details or the sequence.

"[M]: All right.

"[Respondent]: I know they repudiated the agreement to sell at $55,000 upon receiving another unforeseeable offer, unforeseeable as of the date our counteroffer was made." (Exhibit "A" to petitioner's exhibit "O," third page.)

(57) The counteroffer made by respondent on October 15, 1991 was made one week after the October 8, 1991 meeting between respondent and real estate agent [G] wherein the $45,000 offer of [I] was rejected.

(58) At the time the October 15, 1991 counteroffer was made by the respondent to [L], respondent continued to hold in his possession the proposed sales agreement submitted by [G] on behalf of [I] on October 8, 1991.

(59) On or about November 19, 1991, respondent prepared an amendment to the original petition to enforce the settlement agreement and for the imposition of sanctions and served it upon [D].

(60) This amendment alleges, among other things, that [B] had "dishonored an agreement for the sale of the greater part of that (partnership) property," in

reference to the sale of the [    ] Street property to [L]. (Respondent's exhibit "33.")

(61) Thereafter, on or about March 19, 1992, respondent prepared an amended complaint on behalf of [A] against [B] asserting a cause of action for breach of contract and fraud.

(62) This amended complaint, filed by respondent in the Court of Common Pleas of [    ] County, Pennsylvania at G.D. no. [    ] alleges, among other things, that [B]:

"(a) Failed to forthwith list the partnership properties for sale;

"(b) Failed to provide the plaintiff's counsel with a monthly account of the partnership business; and

"(c) Failed to execute the documents necessary to effect the sale of the partnership property."

(63) The failure of [B] to follow through on the sale of the [    ] Street property pursuant to the $55,000 [L] agreement forms at least one of the bases for both the petition to enforce the February 1990 settlement agreement and March 19, 1992 complaint for breach of contract and fraud filed by respondent.

(64) The litigation initiated by respondent to compel [B] to convey his interest in the [    ] Street property for $55,000 was initiated at a time when [B], pursuant to the terms of the aforesaid settlement agreement, was not bound to accept an amount less than $60,000 for the conveyance of such property.

(65) On or about February 4, 1992, respondent filed his own affidavit in support of the action to enforce the parties' prior settlement agreement and the imposition of sanctions at G.D. no. [    ].

(66) In relevant portion, respondent's affidavit provides:

"During the period of March 1991 through the present, I had close contact with the agents attempting to procure buyers for the properties. When it became clear that no buyers would be found at the originally demanded prices, which would have been quite attractive had the properties been maintained, we were forced to substantially decrease our demanded prices. With this we were able to secure a modest offer of $50,000 for the [    ] Street property from a woman named [L]. This offer was rejected but after speaking with both [A] and [B] and obtaining their express approval for the same, I made a counteroffer to sell to [L] for $55,000. That counteroffer was set forth in my letter of October 15, 1991 to [J], a real estate broker. Shortly thereafter, I received a written acceptance of the counteroffer from [L's] attorney, [M]. Thus, a contract for the sale of the property was formed.

"Several days later we received another offer on the property from a woman named [I]. This offer was at $57,000 but of course was made after the contract to convey to [L] was reached. I therefore informed its purveyor, a realty agent named [G], that [I's] offer was too late and that we would honor our agreement with [L].

"Evidently [G] then approached [B] who apparently was quite willing to repudiate the agreement to sell to [L], falsely deny that he authorized my counteroffer at $55,000 and attempt to pit the two bidders against one another to raise the selling price of the property.

"I note here that the [I] offer to buy the [    ] Street property for $57,000 was wholly unforeseeable." (Petitioner's exhibit "X.")

(67) The original agreement submitted by real estate agent [G] on behalf of [I] was not admitted as evidence.

(68) There is no indication in the record, testimony or evidence to indicate that the condition contained in the October 24, 1991 agreement as prepared by Attorney [M] on behalf of [L] with respect to the buyer's pre-approval of all lease agreements was discussed with either [D] or [B] or agreed to by them.

(69) Respondent has not been subject to other disciplinary complaints and has no other disciplinary violations against him.

(70) With respect to the recommendation for discipline, the Office of Disciplinary Counsel submitted a summary citation issued against the respondent for disorderly conduct and certified records obtained from the Court of Common Pleas of [   ] County, Pennsylvania indicating that the respondent had been sentenced to 90 days in jail beginning November 8, 1990 as a result of this conviction on the disorderly conduct charge.

(71) According to the [   ] County docket, on November 9, 1990 respondent was directed to submit to a psychiatric evaluation by one [O] D.O., a forensic psychiatrist and to respond to any follow-up treatment recommended.

(72) The respondent was paroled from his jail sentence on January 3, 1991 without a further recommendation for follow-up psychiatric counseling, evaluation or treatment.

## III. CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Disciplinary Board concludes that clear and convincing

evidence establishes that respondent has violated the following Rules of Professional Conduct:

(1) R.P.C. 4.1(a)—Knowingly making a false statement of material fact or law to a third person.

(2) R.P.C. 4.2—Communicating about the subject of the representation with a party he knows to be represented by another lawyer in the matter.

(3) R.P.C. 8.4(c)—Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

We preface our discussion with an acknowledgement that, in proving charges levied by it, the Office of Disciplinary Counsel has the burden of producing clear and convincing evidence that the Disciplinary Rules have been violated. *Office of Disciplinary Counsel v. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987). Employing this standard and the cognizance that disciplinary matters, at every step, are heard de novo, *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 579, 506 A.2d 872, 875 (1986), we disagree with the Hearing Committee that violations of certain of the charged offenses have been proven with the certaintude required when an attorney is facing disciplinary charges. Without further discussion, then, we dismiss the allegations of the petition charging violations of Rule 3.3(a)(1), relating to false statements of material fact or law to a tribunal; Rule 3.3(a)(4), relating to offering evidence that a lawyer knows to be false; and Rule 3.7, relating to a lawyer being precluded from acting as an advocate at trial in which it is likely he will be a necessary witness.

We, however, concur with the Hearing Committee's conclusions that respondent has violated Rules 4.2, 4.1(a) and 8.4(c), which we discuss seriatim.

### Rule 4.2—*Communication With Party Represented by Counsel*

It is axiomatic that an attorney may not communicate with a party he knows to be represented by counsel. Prohibition against such contact is outlined in Rule 4.2:

"In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." R.P.C. 4.2. See also, *In re Anonymous No. 10 D.B. 85 and 1 D.B. 86*, 47 Pa. D.&C.3d 361 (1987).

Respondent cites two of the exceptions to the rule prohibiting contact—when contacts are consented to by opposing counsel or when matters discussed are not germane to the underlying lawsuit—and avers that both these exceptions apply to his communications with [B].

We find to the contrary.

That contact occurred between [B] and respondent, at times initiated by [B], is not disputed. There is also unrefuted evidence that some leeway was given by Attorney [D] to respondent to discuss certain matters directly with [B], but the scope in which the contact was permitted was restricted.

The settlement agreement concerning the partnership dissolution provided for the listing of the [    ] Street property on a declining sales price basis. The agreement also directed [B] to provide [A's] counsel with monthly

accountings or other documents concerning operation of the partnership business. [D] testified that he authorized respondent to directly contact [B] concerning the status of certain partnership debts, but to refrain from discussion of other substantive matters.

Respondent clearly violated the parameters of this consensual contact when, on October 15, 1991, he discussed with [B] the sale of the [   ] Street partnership property. Respondent offers that [D's] noninvolvement in the marketing effort of the property justifies his direct contact with [B].

Any ambiguity concerning the breadth of [D's] consent to contact with his client is clarified by [D's] correspondence of October 14, 1991, reading in relevant part:

"When I authorized you to contact [B] to inquire into the status of certain debts, I never imagined that you would convert that authorization into an opportunity for direct adversarial discussions with my client.

"You are hereby ordered to cease and desist from any contact with [B]." (Petitioner's Exhibit "D.")

While there is some question as to whether respondent had received this letter prior to his communication concerning the [   ] Street sale with [B], the letter is clearly indicative of [D's] understanding of the extent of his consent to contact with his client.

There is also little doubt that the sale was a matter of substance within the language of the settlement agreement, and, therefore, off limits as an acceptable topic for discussion. Issues concerning the sale of the [   ] Street property were enumerated in the petition to en-

force the settlement agreement filed by respondent in August 1991. Paragraph 13 of the petition provides:

"Notwithstanding his promise of full cooperation, since May of 1991 [B] has failed to fully cooperate with [A's] counsel and [E] Real Estate Services, the authorized real estate agents to effect the sale of the partnership properties." (Petitioner's Exhibit "M.")

The contrary position of the respondent, that the sale of the property was not entangled with the enforcement of the settlement agreement, is therefore untenable and a breach of the rule against contact with represented parties was clearly established.

### Rule 4.1(a)—*Making False Statements of Material Fact or Law to Third Persons*
and
### Rule 8.4(c)—*Engaging in Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation*

At the factual heart of the violations of both of these rules are the allegedly false statements made to third parties involving the sale of the [   ] Street properties. The genesis of the claims of misrepresentations is, again, the nonconsensual contact made by respondent to [B]. Because the properties and their sale were at issue in the petition to enforce, any conversations concerning real estate negotiations should have been conveyed through [D]. By respondent's own admission, he communicated directly with [B] on October 15, 1991 about two possible offers for the [   ] Street property. About a week before, respondent had been contacted by Realtor [G] on behalf of [I] and Realtor [J] on behalf of [L]. Respondent averred that because [D] was not an active participant in marketing the properties, he did not feel

that [D] need be notified of the offers. This assertion, as previously discussed, is inconsistent with the petition to enforce which detailed [B's] failure to cooperate in the sale of the partnership realty.

Nonetheless, on October 15, 1991, respondent, by letter to Realtor [J], conveyed a counteroffer to [L] of $55,000. (Respondent's exhibit 17.) Respondent testified that [B] verbally authorized him to extend the counteroffer—a statement denied by [B] in his testimony.

It appears that respondent and [D] then discussed the "pending sale" on October 16, 1991, when they appeared in court on a scheduling matter concerning the petition to enforce. [D] testified that he advised respondent that [B] would not sell at $55,000. Respondent followed up with correspondence stating that, absent contrary written notice from [D], he would "presume that $55,000 will effect the sale of the subject property." (Respondent's exhibit 11.) [D] immediately responded that: (1) respondent had no authority to convey the counteroffer; (2) that respondent was aware on October 15, 1991 that [B] was not ready to negotiate a sale of the property; and, (3) to proceed any further on the deal was at respondent's own risk. (Respondent's exhibit 20.)

Despite these admonitions, the following day respondent had a conversation with Attorney [M], representing [L], the upshot of which was acceptance of the $55,000 counteroffer. Acceptance of the counteroffer was documented in a letter dated October 18, 1991 from [M] to respondent, with a copy sent to [D].

On October 21, 1991, [D] wrote to respondent concerning the [M] letter:

"Not only have I not received a copy of the written offer you supposedly made, you were not even authorized to make the offer in the first place. I must therefore tell you that [B] is not bound by any agreement made by you with respect to the property in question." (Respondent's exhibit 23.)

Inconceivably, in light of the above, respondent and [M] set a closing date for the sale of the property on November 15, 1991. [D] and [B] were notably absent. [M] thus questioned respondent as to his authority to consummate the sale. A transcript of [M's] questioning reveals the following:

"[M]: Let me ask you this, [respondent], did you receive our acceptance prior to any knowledge coming from [B] or his counsel that they were not willing to accept that $55,000?

"[Respondent]: I do not at this moment recall the details or the sequence." (Petitioner's exhibit 25.)

We agree with the Hearing Committee that, given the circumstances, respondent's ambiguous response to the query concerning his authorization was disingenuous. [D's] refusal to participate in the sale was pointed and left no room for equivocation.

A second allegation of violations of Rules 4.1(a) and 8.4(c) focuses on respondent's statements to [N] of the City of [    ] Treasurer's Office. By correspondence dated November 6, 1991, respondent, in an effort to forestall a sheriff's sale of [    ] Street, represented to [N] that the property was the subject of a sales agreement, that a closing date had been set and that all obligations owed to the city would be satisfied.

As this discussion has detailed, respondent's position that an agreement to sell the property existed is insupportable. Representations to third parties to the con-

trary were false, thus, evidencing violations of both Rules 4.1(a) and 8.4(c).

Respondent's defense to these serious allegations is that [B] and [D] were untruthful in their testimony concerning the authorization to negotiate the sale of the partnership property. In levying this charge, respondent challenges [B's] credibility by reference to [B's] response to respondent's question concerning [B's] employment. While [B] replied that since graduating from college, he has been employed as an architect, in fact, [B] had held other nonarchitecture jobs and was not licensed as an architect until 12 years after graduation. Because [B] was not truthful in detailing his employment history, respondent contends that his entire testimony was tainted. The legal maxim referred to by respondent, "False in one thing, false in everything," to discredit [B] is, however, not applicable. For the maxim, which bears only on the weight to be properly invoked to be assigned to the evidence, see *Universal Builders Inc. v. Moon Motor Lodge Inc.,* 430 Pa. 550, 244 A.2d 10 (1968), to apply the false testimony under scrutiny must be material and given with an intent to deceive. Black's Law Dictionary, 603 (6th ed. 1990).

Our reading of [B's] testimony does not reveal either that [B's] employment as an architect was material to the issue at hand, nor did it reveal an intent to mislead. Thus, we see no reason to question the Hearing Committee's assessment of the credibility of witnesses. In such matters, although our review is de novo, we pay great deference to the Hearing Committee's findings with respect to witness credibility. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 275, 472 A.2d 186, 188 (1983).

So, too, do we defer to the Hearing Committee's assessment of [D's] credibility.

Respondent offers that he and [D] were politically at odds. This outside adversarial relationship does not however translate to a motive to lie and there is no evidence to support that [D] testified falsely in retaliation for respondent's exercise of his political voice, which was apparently unflattering to [D].

One final statement on the credibility issue requires comment. The Hearing Committee detailed some observations of respondent's demeanor during the course of the proceedings before them. We have not considered these remarks, considering them irrelevant to the pertinent issue of whether respondent was authorized to negotiate the sale of the [    ] Street property on behalf of [B].

When determining the appropriate disciplinary sanction for violation of the Rules of Professional Conduct, our analysis should be confined to the respondent's activities which compromise his stature as a member of the bar. *In re Anonymous No. 95 D.B. 85,* 7 Pa. D.&C.4th 232 (1987). Protection of the public being the primary goal of the disciplinary system, see *Lucarini, supra* at 281, 472 A.2d at 190, the discipline imposed should be commensurate with the magnitude of the wrongdoing. *In re Anonymous No. 77 D.B. 83,* 32 Pa. D.&C.3d 507 (1984).

Respondent has no prior disciplinary record. Nor does it appear that respondent's transgressions were motivated by self-interest. Rather, respondent's representation of his client went well beyond a characterization of overzealousness into behavior which violates important standards attorneys are sworn to uphold. Respondent engaged in improper contact with a client represented by counsel. In the course of this prohibited contact, respondent committed the more se-

rious violations by falsely representing the scope of his authority to speak on behalf of [B].

Because of these false statements and because of an arrest and conviction of respondent on a disorderly conduct charge (properly considered as evidence under Disciplinary Board Rule §89.151(b)(8)), an informal admonition does not accurately reflect the gravity of respondent's conduct. We conclude, therefore, that respondent should receive a private reprimand to impress upon him the requirement of "scrupulous conformity to professional ethics." *In re Anonymous No. 77 D.B. 83, supra.*

## V. DETERMINATION

The Disciplinary Board of the Supreme Court of Pennsylvania determines that the respondent, [     ], shall receive a private reprimand. The expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Members Witherel and Leonard did not participate in the adjudication.

## ORDER

And now, September 5, 1995, upon consideration of the report and recommendation of Hearing Committee filed June 13, 1994, it is hereby ordered that the said [respondent] of [     ] County be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in Rule 204(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement.

Costs are to be paid by the respondent.